**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

EARL JORDAN YAOKASIN, Derivatively on
Behalf of AMBAC FINANCIAL GROUP,
INC.,

                              Plaintiff,

       vs.

MICHAEL A. CALLEN, JOHN W. UHLEIN,
III, KEVIN J. DOYLE, GREGG L.
BIENSTOCK, ROBERT G. SHOBACK,
DOUGLAS C. RENFIELD-MILLER, DAVID
W. WALLIS, WILLIAM T. MCKINNON,
ROBERT J. GENADER, KATHLEEN A.
MCDONOUGH, JILL M. CONSIDINE,
PHILIP N. DUFF, THOMAS C. THEOBALD,
LAURA S. UNGER, HENRY D. G.
WALLACE, THOMAS J. GANDOLFO,
SEAN T. LEONARD, W. GRANT
GREGORY, and PHILLIP B. LASSITER,

                            Defendants,

--and--

AMBAC FINANCIAL GROUP, INC.,

                    Nominal Defendant.

------------------------------------------------------- x

Civil Action No. 08-cv-1312

**VERIFIED DERIVATIVE COMPLAINT**
**FOR:**

    **1. BREACH OF FIDUCIARY DUTY;**
        **and**
    **2. UNJUST ENRICHMENT**

**"ECF CASE"**

<u>DEMAND FOR JURY TRIAL</u>

       Plaintiff, derivatively on behalf of Ambac Financial Group, Inc. ("Ambac" and/or the "Company"), upon his personal knowledge as to those allegations concerning himself and based upon information and belief, based upon, among other things, the investigation made by his attorneys, alleges the following:

**SUMMARY OF THE CASE**

       1.      This is a shareholder derivative action on behalf of Ambac seeking to remedy the wrongs that occurred between October 19, 2005 and January 18, 2008, inclusive (the "Relevant"

Period").  Plaintiff seeks remedies for the defendants' violations of state and federal law, including breaches of fiduciary duties and unjust enrichment.

2.      Ambac is a Delaware corporation with its principal executive offices located at One State Street Plaza, New York, New York.  Ambac is a holding company whose subsidiaries provide financial guarantee products and other financial services to clients in both the public and private sectors around the world. The Company and its subsidiaries operate in two segments: financial guarantees and financial services.

3.      Ambac's principal operating subsidiary, Ambac Assurance Corporation, a leading guarantor of public finance and structured finance obligations, has earned triple-A financial strength ratings, the highest ratings available from the three largest rating companies: Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P's"), and Fitch Inc. ("Fitch"). Ambac's financial strength ratings are an essential part of Ambac Assurance's ability to provide credit enhancement and any reduction in these ratings will have a materially adverse affect on Ambac Assurance's ability to compete in the financial guarantee business.

4.      Ambac was the first and remains one of the world's top monoline insurers.  Monoline insurers such as Ambac insure bonds that have been issued by other entities to protect investors in the event of securities default.  Ambac uses its AAA rating to guarantee the timely repayment of bond principal and interest of an issuer in the event the issuer defaults, thereby allowing the debt issued to get the highest possible rating.

5.      Historically, Ambac focused its business on conservative municipal bonds.  More recently, the Individual Defendants have shifted the focus of Ambac away from more conservative bonds to collateralized debt obligations, or CDOs.  CDOs are a type of asset-backed security and structured credit product.  CDOs repackage bonds, mortgages and other assets into new securities and

then use the income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds, loans or other assets, where investors buy slices classified by varying levels of debt or credit risk. Lured by larger profits and higher growth rates, Ambac began writing insurance on CDO's, including CDO's bided by subprime mortgages given to high-risk borrowers.

6.     Driven by their personal monetary gain and financial greed, the Defendants named in this lawsuit caused Ambac shares to trade at artificially inflated levels by causing the Company to issue false and misleading statements about Ambac's financial condition. The Defendants' intentional or negligent issuance of these misleading statements painted a false picture of Ambac's financial condition. In furtherance of their scheme to withhold relevant information from the investing public, Defendants failed to disclose the true state of Ambac's business operations, finances, business meetings, other business and future prospects.

7.     As the bottom fell out of the subprime mortgage industry following the downturn in the American housing market, CDOs began to lose massive amounts of their value. As the real estate and credit markets began falter in early 2007, the Individual Defendants assured Ambac investors that the Company had been very selective in its underwriting standards in the past. The Individual Defendants also assured investors that the Company had maintained an adequate capital cushion to weather the real estate market downturn and the deteriorating credit markets while retaining the Company's supremely important AAA credit rating.

8.     The Individual Defendants maintained this position through mid-2007 even as the housing and credit crises continued to deteriorate. Only in July 2007 did the Company begin to disclose the fact that Ambac had overextended itself into CDOs and the fact that Ambac was not prepared for the housing and credit markets' downturn. Even then, the Individual Defendants refused to cause the Company to disclose the true state of financial disarray at Ambac. Instead, the truth only

leaked out piecemeal, with the full extent of the Company's woes only being fully revealed on January 18, 2008.

9.      Ambac's stock was artificially inflated during the Relevant Period, reaching its high on May 18, 2007 at $96.08 per share.  As the truth emerged regarding Ambac's true financial state, the stock declined to a quarter century low of $6.24, a 93.5% decline in price which resulted in the Company's market capitalization being decimated by $9.1 billion.

10.     Even after the initial partial disclosure of the bad news, the Individual Defendants were able to delay the full truth from being revealed to the public.  The result of the Individual Defendants' actions was that stock maintained its artificially inflated value.

11.     The true financial outlook of the Company became common knowledge only after many subsequent press releases and threats that the Company's financial ratings would be downgraded by the major credit reporting agencies.   The Individual Defendants caused the Company to release many press releases which attempted to downplay Ambac's exposure to CDOs and its precarious financial condition.   Ambac, the pioneering company behind municipal bond insurance which had maintained AAA ratings since 1979, would eventually be downgraded and face serious scrutiny from all major credit rating agencies.  While Fitch has already stripped Ambac of its AAA rating, S&P and Moody's are investigating whether or not to similar downgrade Ambac's ratings. The Individual Defendants have caused irreparable injury to the company by their actions.

12.     Why would the Individual Defendants fail to carry out the fiduciary obligations to the corporation required by their positions as officers and directors?  The answer is simple and all too familiar: money.  Because of Individual Defendants' false statements, Ambac's shares traded at inflated levels.  The Individual Defendants personally benefited from this artificially-inflated price because their compensation is directly tied to the market value of Ambac's shares.

13.     The artificial inflation of Ambac's stock also enabled the Individual Defendants to sell much of their personally-held Ambac common stock for gross proceeds approaching $132 million.

14.     Defendants' conduct has resulted in at least one class action lawsuit, causing further damage to Ambac.  Specifically, on January 16, 2008, the Company and certain of its officers were named as defendants in a shareholder class action lawsuit, *Reimer v. Ambac Financial Group, Inc., et al .,* filed in the United States District Court for the Southern District of New York.  This action alleges that between October 19, 2005 and November 26, 2007, the defendants made false and misleading statements concerning the Company's business and financial results related to its insurance coverage on CDO contracts, in violation of federal securities laws.

15.     Plaintiff Earl Jordan Yaokasin is a current shareholder of Ambac and was a shareholder of Ambac at the time of the transaction complained of herein.  Plaintiff brings this lawsuit in a derivative capacity to redress the harm caused to Ambac by the Individual Defendants.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Ambac maintains operations in New York and is traded on the New York Stock Exchange.  Moreover,

defendants' conduct was purposefully directed at New York and arose in New York, where Ambac maintains its corporate headquarters. Exercising jurisdiction over the named non-resident defendants is reasonable.

18.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Ambac occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

19.    Plaintiff Earl Jordan Yaokasin ("Yaokasin" or "Plaintiff") is currently an Ambac shareholder and was an Ambac shareholder at the time of the transaction complained of herein. Yaokasin is a citizen of California.

20.    Nominal Defendant Ambac is a publicly-traded Delaware corporation with its principal executive offices located at One State Street Plaza, New York, New York 10004. Ambac is a citizen of both Delaware and New York. Nominal Defendant Ambac provides financial guarantees for public finance and structured finance obligations through its principal operating subsidiary, Ambac Assurance Corporation. Ambac also provides financial and investment products, including investment agreements, funding conduits, interest rate, currency and total return swaps, principally to its clients of the financial guarantee business.

21.    Defendant Michael A. Callen is Chairman of the Board of Directors and Chief Executive Officer ("CEO") of the Company and has acted in such capacity since January 16, 2008.

Prior to his promotion, Callen had been the presiding director since October 23, 2006, and a member of the Audit and Risk Assessment, Compensation and Governance Committees for the Ambac Board of Directors in the Relevant Period. Defendant Callen, as Chairman, CEO and formerly as the presiding director was responsible for the financial results and press releases issued by the Company. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein. Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Defendant Callen sold 11,750 shares of Ambac stock for $942,847 in proceeds while in possession of material non-public information. Callen is a citizen of Maryland.

22.    Defendant John W. Uhlein, III is an Ambac Executive Vice President and has been since December 2003. Uhlein was also Chairman of Ambac Assurance UK Limited from 1996 to April 2005; a Managing Director from January 1996 to December 2003; and a First Vice President from September 1993 to January 1996. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein. Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Defendant Uhlein sold 58,924 shares of

Ambac stock for $4,960,338.40 in proceeds while in possession of material non-public information. Uhlein is a citizen of Connecticut.

23.     Defendant Kevin J. Doyle is Ambac's Senior Vice President and General Counsel and has been since January 2005. Doyle is also Ambac's Chief Legal Officer and has been since January 2000.  Doyle was Ambac's Managing Director and General Counsel from January 2000 to January 2005; Managing Director and General Counsel of the Specialized Finance Division Ambac Assurance from January 1996 to January 2000; First Vice President and General Counsel the Specialized Finance Division of Ambac Assurance from January 1995 to January 1996; and Vice President and Assistant General Counsel from 1991 to January 1995. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Defendant Doyle sold 50,862 shares of Ambac stock for $4,224,441.75 in proceeds while in possession of material non-public information. Doyle is a citizen of New York.

24.     Defendant Gregg L. Bienstock is Ambac's Senior Vice President, Chief Administrative Officer and Employment Counsel and has been since January 2005. Bienstock was also Ambac's Managing Director, Human Resources and Employment Counsel from January 1999 to January 2005 and First Vice President, Director of Human Resources and Employment Counsel from February 1997 to January 1999. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press

releases, public filings, and other public statements, including those described herein. Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.    Defendant Bienstock sold 40,117 shares of Ambac stock for $3,375,650.69 in proceeds while in possession of material non-public information. Bienstock is a citizen of New York.

25.    Defendant Robert G. Shoback is an Ambac Senior Managing Director and has been since January 2004. Shoback was also an Ambac Managing Director in the Public Finance Division from November 1998 to January 2004. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein. Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Defendant Shoback sold 26,358 shares of Ambac stock for $2,131,601.70 in proceeds while in possession of material non-public information. Shoback is a citizen of New Jersey.

26.    Defendant Douglas C. Renfield-Miller is an Ambac Executive Vice President and has been since July 2006. Renfield-Miller is also Chairman of Ambac Assurance UK Limited and has been since April 2005. Renfield-Miller was an Ambac Senior Managing Director from January 2004 to July 2006 and a Managing Director from April 2000 to January 2004. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or

knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Defendant Renfield-Miller sold 23,110 shares of Ambac stock for $1,980,837.97 in proceeds while in possession of material non-public information.  Renfield-Miller is a citizen of New York.

27.     Defendant David W. Wallis is Ambac's Senior Managing Director and Head of Portfolio and Market Risk Management and has been since July 2005.  Wallis was also an Ambac Managing Director from July 1999 to June 2005 and a First Vice President from 1996 to July 1999. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.   Defendant Wallis sold 14,216 shares of Ambac stock for $1,200,421.15 in proceeds while in possession of material non-public information, Wallis is a citizen of Kentucky.

28.     Defendant William T. McKinnon is Ambac's Senior Managing Director and Chief Risk Officer and has been since January 2004.  McKinnon was also Ambac's Managing Director and Chief Risk Officer from February 2000 to January 2004; Managing Director and Head of Credit Risk Management for the Specialized Finance Division from October 1998 to February 2000; First Vice

President in the asset-backed securities department from January 1992 to October 1998; and a First Vice President from January 1989 to January 1992.  Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Defendant McKinnon sold 12,895 shares of Ambac stock for $1,143,356.36 in proceeds while in possession of material non-public information.  McKinnon is a citizen of New York.

29.    Defendant Jill M. Considine is the current "Presiding Director" of Ambac and has been since January 16, 2008.  Prior to this position, she served as a director for Ambac and a member of the Audit and Risk Assessment, Compensation and Governance Committees for the Ambac Board of Directors in the Relevant Period.  Considine was elected to the Board of Directors on March 21, 2000.  Because of her positions with Ambac, she directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein.  Further, her position gave her access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  She also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Considine is a citizen of New York.

30.    Defendant Laura S. Unger is a director of Ambac and has been since October 28, 2002.  Unger has been a member of the Audit and Risk Assessment, Compensation and Governance

Committees for the Ambac Board of Directors in the Relevant Period.  Because of her position with Ambac, she directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein.  Further, her position gave her access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  She also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Unger is a citizen of New York.

31.    Defendant Robert J. Genader was Ambac's Chairman of the Board from July 2006 to January 2008.  Genader was also Ambac's CEO from January 2004 to January 2008; President from January 2001 to January 2008; a director from 1992 to January 2008; Chief Operating Officer from January 2001 to January 2004; Vice Chairman from January 1998 to January 2001; and Executive Vice President from 1986 to January 1998. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, his positions gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.   Defendant Genader sold 360,013 shares of Ambac stock for $30,015,291.31 in proceeds while in possession of material non-public information. Genader is a citizen of Connecticut.

32.    Defendant Kathleen A. McDonough was an Ambac Senior Managing Director from January 2004 to August 2007. McDonough was also Ambac's Managing Director in the Public

Finance Division from January 1996 to January 2004.  McDonough served Ambac in various capacities since July 1991.  Because of her positions with Ambac, she directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac' press releases, public filings, and other public statements, including those described herein.  Further, her positions gave her access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  She also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Defendant McDonough sold 26,437 shares of Ambac stock for $2,239,603.89 in proceeds while in possession of material non-public information. McDonough is a citizen of New York.

33.    Defendant Henry D. G. Wallace is a director of Ambac and has been since May 5, 2004.  Wallace has been the Chairman of the Audit and Risk Assessment, as well as a member Compensation and Governance Committees for the Ambac Board of Directors in the Relevant Period. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein.  Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects.  He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading.  Wallace is a citizen of Florida.

34.    Defendant Thomas C. Theobald is a director of Ambac and has been since August 19, 2004.  Theobald has been a member of the Audit and Risk Assessment, Compensation and Governance Committees for the Ambac Board of Directors in the Relevant Period.  Because of his

positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Theobald is a citizen of Connecticut.

35.    Defendant Philip N. Duff is a director of Ambac and has been since May 8, 2007. Duff has been a member of the Audit and Risk Assessment, Compensation and Governance Committees for the Ambac Board of Directors in the Relevant Period. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Duff is a citizen of Connecticut.

36.    Defendant Thomas J. Gandolfo is, and at all relevant times was, Senior Managing Director of Ambac and Ambac Assurance. Gandolfo was also Ambac's Senior Vice President and Chief Financial Officer from January 2003 to June 2005; Corporate Controller from July 1998 to January 2003; and Controller of Ambac's Investment Agreement Business from 1994 to July 1998. Gandolfo also serves as head of Global Structured Credit, Derivative Products, Fixed Income Investment Management and Risk Transfer groups of Ambac. Defendant Gandolfo joined Ambac in

1994. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Defendant Gandolfo sold 25,287 shares of Ambac stock for $2,212,278.67 in proceeds while in possession of material non-public information. Gandolfo is a citizen of Connecticut.

37.    Defendant Sean T. Leonard is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Ambac and Ambac Assurance. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Leonard is a citizen of New Jersey.

38.    Defendant W. Grant Gregory was, at relevant times, a member of the Board of Directors. Gregory has been a member of Ambac's Board of Directors since 1991, and was Presiding Director from May of 2006 until October of 2006. Gregory remained on the Board of Directors until his retirement on January 13, 2008. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of

Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Gregory is a citizen of Connecticut.

39.    Defendant Phillip B. Lassiter was Chairman of the Board and CEO of Ambac from July 1991 until January 2004 and Chairman until his retirement in July 2006. Lassiter continues to serve as a director of the Company. Because of his positions with Ambac, he directed the business of Ambac and had responsibility for, control of, and/or knowledge of the content and timing of all of Ambac's press releases, public filings, and other public statements, including those described herein. Further, his position gave him access to non-public information about Ambac's business, finances, products, markets, and present and future business prospects. He also knew that the unfavorable facts specified herein had not been disclosed to the investing public and that the positive representations which were being made were both false and misleading. Lassiter reaped proceeds of $40.6 million by selling his Ambac stock while in possession of material, non-public information. Defendant Lassiter sold 941,438 shares of Ambac stock for $77,532,993 in proceeds while in possession of material non-public information. Lassiter is a citizen of Florida**.**

40.    Defendants Callen, Considine, Unger, Theobald, Wallace, Duff, Gandolfo, Genader, Leonard, Gregory, Uhlein, Doyle, Bienstock, Shoback, Renfield-Miller, Wallis, McKinnon, McDonough, and Lassiter are sometimes collectively referred to in this Complaint as the "Individual Defendants."

41.    The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named in this action as DOES 1-20, inclusive, are unknown to Plaintiff, who therefore

sues these Defendants by such fictitious names.  Plaintiff will amend this complaint to show their true name(s) and capacities when they have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of these fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by conduct of these fictitiously-named Defendants.

42.    Plaintiff is informed and believes, and on that basis alleges, that at all relevant times herein mentioned, each of the Defendants was the agent, principal, representative and/or employee of each of the other Defendants, and in doing the things mentioned herein, was acting within the scope of said agency, representation and/or employment with permission of each co-defendant.

## FACTUAL ALLEGATIONS

### BACKGROUND

43.    Ambac provides financial guarantee products and other financial services to clients in the public and private sectors worldwide.  Ambac operates in two segments: financial guarantee and financial services.  The financial guarantee segment offers financial guarantee insurance and other credit enhancement products, such as credit derivatives for public finance and structured finance obligations.  It also provides financial guarantees for bond issues and other forms of debt financing.  This segment sells its products in the U.S. public finance market, the U.S. structured finance and asset-backed market, and the international finance market.  The financial services segment provides financial and investment products comprising investment agreements, funding conduits, interest rate, currency, and total return swaps, principally to clients of the financial guarantee business, which includes municipalities and other public entities, health care organizations, investor-owned utilities, and asset-backed issuers.

44.    During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of Ambac, were privy to confidential and proprietary information concerning Ambac, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Ambac, as discussed in detail below.  Because of their positions with Ambac, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

45.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

46.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Ambac's financial condition and performance, growth, operations, financial statements, business, products, markets, management,

earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Ambac's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

47.    Each of the Individual Defendants had knowledge of Ambac's problems and took steps to conceal the Company's tribulations by causing an erroneous financial statements and press releases to be issued. These statements and releases were either materially false or failed to disclose adverse facts known to each of the Individual Defendants about Ambac.

### FALSE AND MISLEADING STATEMENTS

48.    The Individual Defendants caused the Company to issue a press release on October 19, 2005, entitled "Ambac Financial Group, Inc. Announced Third Quarter Net Income of $175.1 Million, Down 5% which stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) today announced third quarter 2005 net income of $175.1 million, or $1.61 per diluted share. This represents a 5% decrease from third quarter 2004 net income of $183.5 million, and a 2% decrease in net income per diluted share from $1.65 in the third quarter of 2004. The third quarter 2005 results were negatively impacted by a loss provision amounting to $60.0 million on an after-tax basis, or $0.55 per diluted share, related to its exposure to municipal finance credits impacted by Hurricane Katrina.
>
> Net Income Per Diluted Share
>
> Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.
>
> Earnings measures reported by research analysts typically exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other

items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2005, net security gains and losses had the effect of increasing net income by $8.8 million, $0.08 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $28.5 million, or $0.26 per diluted share for the third quarter 2005.

*     *     *

Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "Our operating results, excluding the $0.55 per share impact of Hurricane Katrina, were pretty good considering the tight credit spreads and increased competition that have persisted during the past 18 months. Domestic top-line production in both public and structured finance was encouraging, with attractive deals closed in a wide array of sectors. European booked business was sparse despite strong activity and growing pipelines - it remains a lumpy and less predictable business flow with long lead times." Mr. Genader continued, "The story of the quarter was Hurricane Katrina and the physical destruction and human suffering that it wrought. While early in the assessment process, we have completed a detailed loss analysis using the best information we could develop. By its very nature, it will be an evolving situation which will require and get our full attention on surveillance and active remediation. On a positive note, the balance of our risk portfolio showed improvement."

Revenues

Highlights

Credit enhancement production in the third quarter of 2005 was $256.6 million, down 6% from the third quarter of 2004 which came in at $273.7 million. Growth in U.S. public finance was more than offset by a decline in production in U.S. structured finance and international.

Credit enhancement production for the nine months of 2005 of $853.5 million was 10% lower than credit enhancement production of $943.6 million in the same period of 2004 primarily driven by tighter credit spreads across many of the markets that Ambac serves.

*     *     *

Net premiums earned and other credit enhancement fees for the third quarter of 2005 were $231.1 million, which represented an 18% increase from the $195.3 million earned in the third quarter of 2004. Net premiums earned increased for all market sectors but was most significant in U.S. public finance where accelerated premiums were very strong during the quarter.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $48.9 million in the third quarter of 2005 (which had a net income per diluted share effect of $0.26), up 133% from $21.0 million ($0.11 per diluted share) in accelerated premiums in the third quarter of 2004. The third quarter 2005 was impacted by one large refunded transaction, representing almost half of the total accelerated amount. Long-term interest rates have remained relatively low during 2005 and we continue to see strong refunding activity in our public finance segment. However, as interest rates rise, the level of accelerated premiums should decline.

*     *     *

Net investment income for the third quarter of 2005 was $110.6 million, representing an increase of 22% from $90.5 million in the comparable period of 2004. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the third quarter of 2005 was $98.5 million, representing an increase of 10% from $89.6 million in the third quarter of 2004. This increase was due primarily to the growth in the investment portfolio driven by ongoing collection of financial guarantee premiums and fees and a net positive adjustment to investment income for certain municipal securities within the investment portfolio that have been pre-refunded. A pre-refunding shortens the maturity of a bond resulting in accelerated amortization of bond premium or discount These positive effects on investment income during the period were partially offset by a lower reinvestment rate and use of cash for repurchases of Ambac stock during 2005 totaling approximately $300 million. Net investment income from VIEs for the third quarter of 2005 was $12.1 million, up from $0.9 million in the third quarter of 2004. Investment income from VIEs results from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46. The increase in interest income from VIEs reflects the consolidation of two transactions executed in the fourth quarter of 2004. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

Net investment income (including net investment income from VIEs) for the nine months of 2005 was $317.1 million, representing an increase of 19% from $267.1 million in the comparable period of 2004, primarily as a result of the reasons provided above.

*     *     *

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $3.7 million quarter of 2005 from $86.6 million at June 30, 2005 to $82.9 million at September 30, 2005.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on insured transactions that are considered adversely classified. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $79.3 million during the quarter, primarily as a result of municipal exposures to the region impacted by Hurricane Katrina. Ambac's exposure to losses as a result of the hurricane is derived primarily from its guarantees of municipal bonds in the greater New Orleans area and the Gulf-front regions that were most severely impacted by the storm. The company has classified 35 individual obligations in the region with total net par outstanding of approximately $1.1 billion. To date, Ambac has paid three claims on obligations in the region, totaling approximately $2.0 million and has subsequently recovered the full amounts. In determining our loss estimate, our analysis has considered the unprecedented nature of the disaster, including the displacement of the communities' residents, and the unique aspects of each insured bond, such as the nature of the revenue source, the level of debt service reserves, if any, and other transaction protections. Ambac's estimate of losses related to the hurricane was made without regard to any potential federal, state or local government assistance to individual municipalities or institutions. The credit loss estimation process involves the exercise of considerable judgment. Due to the nature of the loss reserve estimate, Ambac's ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results. Ambac will continue to assess the impact of Hurricane Katrina on the fourth quarter and subsequent periods as more information becomes available to us. Ambac does not have material exposure to credits adversely affected by Hurricane Rita. Outside of the ACR activity related to the hurricane, the remaining portfolio experienced slightly favorable credit migration during the quarter.

Other Items

Total net securities gains/(losses) for the third quarter of 2005 were $14.5 million on a pre-tax basis, or $0.08 per diluted share; consisting of net realized gains on investment securities of $9.5 million, net mark-to-market gains on credit and total return derivatives of $3.9 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million. For the third quarter of 2004, net securities gains/(losses) were $10.1 million on a pre-tax basis, or $0.06 per diluted share; consisting of net realized gains on investment securities of $6.6 million, net mark-to-market gains on credit and total return derivatives of $3.0 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million.

Total net securities gains/(losses) for the nine months of 2005 were $53.1 million, or $0.27 per diluted share, consisting of net realized gains on investment securities of $10.8 million, net mark-to-market losses on credit and total return derivatives of ($7.0) million and net mark-to-market gains on non-trading derivative contracts of $49.3 million. As discussed in the previous quarter, the mark-to-market gains on non-trading derivative contracts related almost entirely to interest rate hedge contracts related to long-term fixed rate liabilities in Ambac's investment agreement

business that were highly effective from an economic perspective but did not meet the technical requirements of FAS 133. As of July 1, 2005, the hedges were redesignated to meet the technical requirements and it is expected that the mark-to-market of the hedge and hedged item will substantially offset each other in the income statement prospectively. For the nine months of 2004 net securities gains were $29.3 million, or $0.17 per diluted share, consisting of net realized gains on investment securities of $27.6 million, mark-to-market gains on credit derivatives and total return swaps of $15.2 million and net mark-to-market losses on non-trading derivative contracts of ($13.5) million.

> Balance Sheet
>
> Highlights
>
> Total assets as of September 30, 2005 were $19.06 billion, up 2% from total assets of $18.74 billion at December 31, 2004. The increase was driven by cash generated from business written during the period offset by a decrease in the unrealized gains in the investment portfolio driven by higher long-term interest rates and stock repurchases during the period. As of September 30, 2005, stockholders' equity was $5.19 billion, a 3% increase from year-end 2004 stockholders' equity of $5.02 billion. The increase was primarily the result of net income during the period, offset by lower "Accumulated Other Comprehensive Income," driven by higher long-term interest rates and stock repurchases during the period.

49.    On November 29, 2005, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Financial Group, Inc. Announces the Offering of $400 Million of 30-Year Debentures", which stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) announced today the offering of $400 million of 5.95% Debentures due December 5, 2035.
>
> The Debentures were priced at a slight discount to par.
>
> The Debentures are rated Aa2 by Moody's Investors Service, Inc. and are rated AA by Standard and Poor's Ratings Services.
>
> The Company intends to use the proceeds for general corporate purposes and the redemption of all or a portion of the outstanding $200 million 7.00% Debentures due in 2051, on or after its first call date in October 2006.
>
> Citigroup, Goldman Sachs & Co. and Merrill Lynch & Co. acted as joint lead managers for the underwriting syndicate.

50.    On January 25, 2006, the Individual Defendants caused Ambac to issue its fourth quarter 2005 financial results in a press release that stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced fourth quarter 2005 net income of $204.3 million, or $1.90 per diluted share. This represents an 8% increase from fourth quarter 2004 net income of $188.8 million, and a 12% increase in net income per diluted share from $1.69 in the fourth quarter of 2004.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2005, net security gains and losses had the effect of increasing net income by $13.2 million, $0.12 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $20.3 million, or $0.19 per diluted share for the fourth quarter 2005.

*      *      *

Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "Our top-line credit enhancement production results are encouraging as we successfully closed a wide array of transactions during the quarter, including a few deals of significant size. Overall, market conditions remain challenging, yet our experienced professionals continue to identify new and attractive opportunities across a broad spectrum of asset classes and geographic locations. I remain cautiously optimistic going into 2006 as demand for our core financial guaranty product seems to be on the rise."

Revenues

Highlights

Credit enhancement production in the fourth quarter of 2005 was $395.8 million, up 15% from the fourth quarter of 2004 which came in at $344.2 million.

Strong growth in U.S. public finance and U.S. structured finance were partially offset by a decline in international.

Credit enhancement production for the full year 2005 of $1,249.4 million was 3% lower than credit enhancement production of $1,287.8 million in 2004, driven by tighter credit spreads across many of the markets Ambac serves and a slow down in transactions in the international market, primarily Europe.

\*       \*       \*

Net premiums earned and other credit enhancement fees for the fourth quarter of 2005 were $217.5 million, which represented a 14% increase from the $190.4 million earned in the fourth quarter of 2004. Increases in net premiums earned in U.S. public finance and U.S. structured finance were partially offset by decreased net premiums earned in international.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $35.4 million in the fourth quarter of 2005 (which had a net income per diluted share effect of $0.19), up 179% from $12.7 million ($0.07 per diluted share) in accelerated premiums in the fourth quarter of 2004. The majority of the accelerated premiums relate to the U.S. public finance segment. The current quarter was once again impacted by one large public finance refunded transaction, representing 41% of the total accelerated amount. Long-term interest rates remained relatively low during the year and we experienced extremely high refunding activity in our public finance segment. However, as interest rates rise, the level of accelerated premiums should decline.

\*       \*       \*

Net investment income for the fourth quarter of 2005 was $109.0 million, representing an increase of 16% from $94.0 million in the comparable period of 2004. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the fourth quarter of 2005 was $96.7 million, representing an increase of 6% from $90.9 million in the fourth quarter of 2004. This increase was due primarily to the growth in the investment portfolio driven by ongoing collection of financial guarantee premiums and fees, partially offset by a lower reinvestment rate and use of cash for repurchases of Ambac stock during the second and third quarters of 2005 totaling approximately $300 million. Net investment income from VIEs for the fourth quarter of 2005 was $12.3 million, up from $3.1 million in the fourth quarter of 2004. Investment income from VIEs results from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46. The increase in interest income from VIEs reflects the consolidation of two transactions executed in the fourth quarter of 2004. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

Net investment income (including net investment income from VIEs) for the full year 2005 was $426.1 million, representing an increase of 18% from $361.1 million in the comparable period of 2004, primarily as a result of the reasons provided above.

\*       \*       \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $20.2 million during the fourth quarter of 2005 from $82.9 million at September 30, 2005 to $103.1 million at December 31, 2005. The increase was primarily related to a new case reserve established during the quarter for a public finance infrastructure transaction and an addition to an existing case reserve for a stressed health care transaction.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $7.2 million during the quarter, primarily as a result of net improvement in the classified portfolio and a transfer of ACR reserves to case reserves related to the public finance infrastructure transaction discussed above. At December 31, 2005, the specific Hurricane Katrina-related provision amounted to $91.5 million, down slightly from $92.0 million at September 30 due to amortization and pay downs on effected credits. Approximately $1.1 billion of Katrina-impacted credits are included in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter and has fully recovered the amounts paid in the third quarter. Ambac's estimate of losses related to the hurricane does not consider any potential, federal, state or local government assistance to individual municipalities or institutions as such assistance still has not been determined. The credit loss estimation process involves the exercise of considerable judgment. Ambac will continue to assess the impact of Hurricane Katrina on subsequent periods as more information becomes available to us and the ultimate actual loss associated with the hurricane may be materially different than the current estimate and thereby may affect future operating results.

Other Items

Total net securities gains/(losses) for the fourth quarter of 2005 were $20.0 million, or $0.12 per diluted share; consisting of net realized losses on investment securities of ($2.2) million, net mark-to-market gains on credit and total return derivatives of $22.0 million and net mark-to-market gains on non-trading derivative contracts of $0.2 million. For the fourth quarter of 2004, net securities gains/(losses) were $16.5 million, or $0.09 per diluted share; consisting of net realized gains on investment securities of $7.5 million, net mark-to-market gains on credit and total return derivatives of $11.9 million and net mark-to-market losses on non-trading derivative contracts of ($2.9) million.

Total net securities gains/(losses) for the full year 2005 were $73.1 million, or $0.40 per diluted share, consisting of net realized gains on investment securities of $8.6 million, net mark-to-market gains on credit and total return derivatives of $15.0 million and net mark-to-market gains on non-trading derivative contracts of $49.5 million. As discussed in the previous quarters, the mark-to-market gains on non-trading derivative contracts related almost entirely to interest rate hedge contracts related to long-term fixed rate liabilities in Ambac's investment agreement business that were highly effective from an economic perspective but did not meet the technical requirements of FAS 133. The hedges have been redesignated to meet the technical requirements and it is expected that the mark-to-market of the hedge and hedged item will substantially offset each other in the income statement prospectively. For the full year 2004 net securities gains were $45.8 million, or $0.27 per diluted share, consisting of net realized gains on investment securities of $35.1 million, net mark-to-market gains on credit and total return derivatives of $27.1 million and net mark-to-market losses on non-trading derivative contracts of ($16.4) million.

Balance Sheet

Highlights

Total assets as of December 31, 2005 were $19.77 billion, up 5% from total assets of $18.75 billion at December 31, 2004. The increase was driven by cash generated from business written during the period and the proceeds of the $400 debt issuance in December 2005 (discussed below), offset by stock repurchases during the period and the decrease in the unrealized gains in the investment portfolio driven by higher long-term interest rates. As of December 31, 2005, stockholders' equity was $5.40 billion, a 7% increase from year-end 2004 stockholders' equity of $5.02 billion. The increase was primarily the result of net income during the year, offset by stock repurchases and lower "Accumulated Other Comprehensive Income" driven by slightly higher long-term interest rates.

51.     On April 26, 2006, the Individual Defendants caused Ambac to issue a press release containing the first quarter financial results for 2006.  The press release stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced first quarter 2006 net income of $221.1 million, or $2.06 per diluted share. This represents a 19% increase from first quarter 2005 net income of $185.5 million, and a 24% increase in net income per diluted share from $1.66 in the first quarter of 2005.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly

GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain non-recurring and other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the first quarter 2006, net security gains and losses had the effect of increasing net income by $8.1 million, $0.08 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $12.0 million, or $0.11 per diluted share for the first quarter 2006.

*     *     *

Commenting on the overall results, Ambac President and Chief Executive Officer, Robert J. Genader, noted, "This was another solid quarter for Ambac in a challenging business environment. The company's scale, market diversification and capacity continue to be highly valued by our global clients. These important attributes enable us to participate across a broad spectrum of profitable transactions both domestic and international." Mr. Genader further commented, "Although very large transactions were generally absent during the first quarter, several notable international deals have already closed in April."

Revenues

Highlights

–    Credit enhancement production in the first quarter of 2006 was $233.5 million, up 17% from the first quarter of 2005 which came in at $199.0 million. Growth in international and U.S. structured finance were partially offset by a decline in U.S. public finance.

*     *     *

–    Net premiums earned and other credit enhancement fees for the first quarter of 2006 were $208.4 million, which represented a 2% decrease from the $211.7 million earned in the first quarter of 2005. Increases in net premiums earned in U.S. public finance and U.S. structured finance were partially offset by decreased net premiums earned in international.

Net premiums earned include accelerated premiums, which result from refundings, calls and other accelerations recognized during the quarter. Accelerated premiums were $25.0 million in the first quarter of 2006 (which had a net income per diluted share effect of $0.11), down 28% from $34.5 million ($0.17 per diluted

share) in accelerated premiums in the first quarter of 2005. The majority of the accelerated premiums relate to the U.S. public finance segment. As long-term interest rates rise, the level of accelerated premiums from refundings should decline from prior years' levels. Accelerated premiums in the first quarter of 2006 and 2005 include $7.7 million and $4.5 million, respectively, related to the impact of reinsurance cancellations, as discussed below under "Reinsurance Cancellations."

\*          \*          \*

–        Net investment income for the first quarter of 2006 was $114.0 million, representing an increase of 12% from $102.0 million in the comparable period of 2005. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the first quarter of 2006 was $101.8 million, representing an increase of 12% from $90.7 million in the first quarter of 2005. This increase was due primarily to the growth in the investment portfolio driven by ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company in the fourth quarter of 2005. Net investment income was also modestly affected by increases in interest rates. Net investment income from VIEs for the first quarter of 2006 was $12.2 million, up from $11.3 million in the first quarter of 2005. Investment income from VIEs results from the consolidation of certain trusts that Ambac has insured and consolidated under accounting pronouncement FIN 46. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

–        Other income for the first quarter of 2006 was $29.5 million, significantly higher than $2.4 million reported in the comparable period of 2005. During the first quarter of 2006, Ambac sold the remaining three aircraft from a previously reported defaulted enhanced equipment trust certificate transaction. The gain on the sale of the aircraft amounted to $25.0 million and is included in "other income" rather than as a loss recovery because the aircraft had been classified as operating assets for the short period of time in which the company took possession of them after the default.

–        Financial services. The financial services segment is comprised of the investment agreement business and derivative products business. The investment agreement business is managed with the goal of approximately matching the cash flows of the investment agreement liabilities with the cash flows of the related investment portfolio. The primary activities in the derivative products business are intermediation of interest rate and currency swap transactions and taking total return swap positions on certain fixed income obligations. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, was $11.7 million in the first quarter of 2006, down 22% from $15.0 million in the first quarter of 2005. The decrease was driven by lower inception

revenues on new business in the derivative products business, partially offset by spread improvement in the investment agreement business.

Reinsurance Cancellations

–    During the first quarter 2006 Ambac cancelled its remaining reinsurance contracts with two reinsurers - AXA Re Finance S.A. and American Re-Insurance Company and recaptured $3.9 billion of par outstanding. Both reinsurers had exited the financial guarantee reinsurance business in 2003. Included in ceded premiums in our Consolidated Statement of Operations is $37.0 million in returned premiums from the cancellations, of which approximately $29.3 million was deferred. The difference, $7.7 million, included in accelerated premiums, results from the difference between the negotiated amount of returned premiums and the associated unearned premium remaining on the previously ceded portion of the underlying guarantees. . . .

During the first quarter 2005 Ambac cancelled a reinsurance contract with Radian Reinsurance Inc and recaptured approximately $7.5 billion of par outstanding. Included in ceded premiums in our Consolidated Statement of Operations is $55.8 million in returned premiums from the cancellation, of which approximately $51.3 million was deferred. The difference, $4.5 million, is included in accelerated premiums.

*      *      *

Loss Reserve Activity

–    Case basis loss reserves (loss reserves for exposures that have defaulted) increased $18.2 million during the first quarter of 2006 from $103.1 million at December 31, 2005 to $121.3 million at March 31, 2006. The increase was primarily related to additional case reserves for a public finance infrastructure transaction and an MBS transaction, partially offset by $7.8 million in payments during the quarter.

–    Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $25.9 million during the quarter, primarily as a result of net improvements in the classified portfolio and a transfer of ACR reserves to case reserves for the MBS transaction noted above. At March 31, 2006, the specific Hurricane Katrina-related provision amounts to $91.1 million, down slightly from $91.5 million at December 31, 2005. Approximately $1.1 billion of Katrina-impacted credits remain in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter.

Other Items

–    Total net securities gains/(losses) for the first quarter of 2006 were $13.5 million, or $0.08 per diluted share; consisting of net realized gains on investment securities of $5.1 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market gains on non-trading derivative contracts of $1.2 million. For the first quarter of 2005, net securities gains/(losses) were $9.1 million, or $0.05 per diluted share; consisting of net realized gains on investment securities of $1.9 million, net mark-to-market gains on credit and total return derivatives of $6.0 million and net mark-to-market gains on non-trading derivative contracts of $1.2 million.

Balance Sheet

Highlights

–    Total assets as of March 31, 2006 were $19.74 billion, up 1% from total assets of $19.73 billion at December 31, 2005. The increase was driven by cash generated from operations during the period, partially offset by the decrease in unrealized gains in the investment portfolio driven by higher long-term interest rates and stock repurchases during the period amounting to approximately $30.0 million. As of March 31, 2006, stockholders' equity was $5.47 billion, a 2% increase from year-end 2005 stockholders' equity of $5.37 billion. The increase was primarily the result of net income during the period, offset by stock repurchases and lower "Accumulated Other Comprehensive Income" driven by higher long-term interest rates.

52.    On July 26, 2006, the Individual Defendants caused Ambac to issue a press release

which reported the second quarter financial results for 2006.  The press release stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced second quarter 2006 net income of $238.6 million, or $2.22 per diluted share. This represents a 28% increase from second quarter 2005 net income of $186.1 million, and a 31% increase in net income per diluted share from $1.69 in the second quarter of 2005.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated

premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the second quarter 2006, net security gains and losses had the effect of increasing net income by $32.9 million, $0.31 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $22.8 million, or $0.21 per diluted share for the second quarter 2006.

*      *      *

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "I am encouraged by the strong credit enhancement production and solid financial results for the quarter. The company's ability to produce record results in this suboptimal business environment is a testament to our people and our strategy. We continue to uncover attractive opportunities to put our capital to work in the short-term and I am confident that the company is well positioned both domestically and internationally for the long-term."

Revenues

Highlights

–      Credit enhancement production in the second quarter of 2006 was $531.0 million, up 33% from the second quarter of 2005 which came in at $397.9 million. Growth in international and U.S. structured finance was partially offset by a decline in U.S. public finance.

Credit enhancement production for the six months of 2006 of $764.4 million was 28% higher than credit enhancement production of $596.9 million in the same period of 2005.

*      *      *

Structured finance earned premiums and other credit enhancement fees grew 9%. The rate of growth in structured finance has improved as the recent level of writings in asset classes such as commercial asset-backed securities, auto securitizations and pooled debt obligations has increased. Narrow credit spreads and high prepayment speeds in the mortgage-backed and home equity book of business and early terminations of transactions in other structured finance sectors continue to partially offset the positive effects of new business writings.

International earned premiums and other credit enhancement fees decreased by 6%. The decline was driven primarily by significant paydowns and calls over the past several quarters, a slow-down in new business generated in the past several quarters prior to this quarter, and the recent business mix which has trended towards long-dated infrastructure transactions that earn premiums over a longer period of time than typical structured finance exposures.

–       Net investment income for the second quarter of 2006 was $117.0 million, representing an increase of 12% from $104.5 million in the comparable period of 2005. Net investment income excluding net investment income from Variable Interest Entities ("VIEs") for the second quarter of 2006 was $104.5 million, representing an increase of 13% from $92.2 million in the second quarter of 2005. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company in the fourth quarter of 2005. Net investment income was also modestly affected by recent increases in interest rates. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

*       *       *

Financial services revenues were $22.5 million in the first half of 2006, up 24% from the $18.2 million of revenues in the first half of 2005 primarily due to the reason provided above.

*       *       *

Loss Reserve Activity

–       Case basis loss reserves (loss reserves for exposures that have defaulted) increased $17.4 million during the second quarter of 2006 from $121.3 million at March 31, 2006 to $138.7 million at June 30, 2006. The increase was primarily related to additional case reserves for a healthcare transaction and an addition to loss adjustment expense reserves. Paid claims during the quarter amounting to $20.1 million included a payment on a CDO which had previously been classified within the active credit reserves, paid and terminated during the current quarter.

–       Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR decreased by $24.7 million during the quarter, from $171.7 million at March 31, 2006 to $147.0 million at June 30, 2006. The decrease was primarily the result of net improvements in the classified portfolio and a transfer of ACR reserves to case reserves for the CDO transaction noted above. At June 30, 2006, the specific Hurricane Katrina-related provision amounts to $90.4 million, down slightly from $91.1 million at March 31, 2006. Approximately $1.1 billion of Katrina-impacted credits remain in Ambac's adversely classified credit portfolio. Ambac did not pay any Katrina-related claims during the quarter.

Other Items

–       Total net securities gains/(losses) for the second quarter of 2006 were $51.0 million, or $0.31 per diluted share; consisting of net realized gains on

investment securities of $44.4 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market losses on non-trading derivative contracts of ($0.6) million. Approximately $38 million of the net realized gains on investment securities relate to cash recoveries received during the quarter related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the second quarter of 2005, net securities gains(losses) were $29.6 million, or $0.14 per diluted share; consisting of net realized losses on investment securities of ($0.6) million, net mark-to-market losses on credit and total return derivatives of ($17.0) million and net mark-to-market gains on non-trading derivative contracts of $47.2 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts related to long-term fixed rate liabilities in Ambac's investment agreement business that were redesignated during that quarter. Those hedges were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

Total net securities gains/(losses) for the first half of 2006 were $64.4 million, or $0.38 per diluted share; consisting of net realized gains on investment securities of $49.5 million, net mark-to-market gains on credit and total return derivatives of $14.4 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million. For the first half of 2005 net securities gains were $38.8 million, or $0.19 per diluted share; consisting of net realized gains on investment securities of $1.3 million, mark-to-market losses on credit derivatives and total return swaps of ($10.9) million and net mark-to-market gains on non-trading derivative contracts of $48.4 million.

Balance Sheet

Highlights

–    Total assets as of June 30, 2006 were $20.27 billion, up 3% from total assets of $19.73 billion at December 31, 2005. The increase was driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio driven by higher long-term interest rates.

As of June 30, 2006, stockholders' equity was $5.63 billion, a 5% increase from year-end 2005 stockholders' equity of $5.37 billion. The increase was primarily the result of net income during the period, offset by lower "Accumulated Other Comprehensive Income" driven by higher long-term interest rates.

53.    The Individual Defendants caused Ambac to issue a press release on October 25, 2006, revealing the Company's strong net income, up 22% from the previous year's third quarter. The press release stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced third quarter 2006 net income of $213.5 million, or $1.98 per diluted share. This represents a 22% increase

- 34 -

from third quarter 2005 net income of $175.1 million, and a 23% increase in net income per diluted share from $1.61 in the third quarter of 2005.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2006, net security gains and losses had the effect of increasing net income by $6.5 million, $0.06 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $14.5 million, or $0.13 per diluted share for the third quarter 2006.

\*       \*       \*

Revenues

Highlights

Credit enhancement production in the third quarter of 2006 was $216.2 million, down 16% from the third quarter of 2005 which came in at $256.6 million. Growth in international was more than offset by declines in U.S. public finance and U.S. structured finance.

Credit enhancement production for the nine months of 2006 of $980.7 million was 15% higher than credit enhancement production of $853.5 million in the same period of 2005, driven by growth in the international and U.S. structured finance markets during the nine-month period.

\*       \*       \*

Structured finance earned premiums and other credit enhancement fees grew 12%. The rate of growth in structured finance has improved as the recent level of writings in asset classes such as commercial asset-backed securities, auto securitizations and pooled debt obligations has increased. Narrow credit spreads and high prepayment speeds in the mortgage-backed and home equity book of business and early terminations of transactions in other structured finance sectors continue to partially offset the positive effects of new business writings.

International earned premiums and other credit enhancement fees decreased by 6%. The decline was driven primarily by significant paydowns and calls over the past several quarters and the recent business mix which has trended towards long-dated infrastructure transactions that earn premiums over a longer period of time than typical structured finance exposures.

Net investment income (including net investment income from VIEs) for the third quarter of 2006 was $120.2 million, representing an increase of 9% from $110.6 million in the comparable period of 2005. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees and a $200 million capital contribution from the parent company in the fourth quarter of 2005, partially offset by a $5.3 million net positive adjustment booked in the third quarter 2005 for municipal bonds within the portfolio that had been pre-refunded. Investment income from VIEs is offset by interest expense on VIEs, shown separately in the Consolidated Statements of Operations.

*    *    *

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $12.0 million during the third quarter of 2006 from $138.7 million at June 30, 2006 to $126.7 million at September 30, 2006. The decrease was driven primarily by claim payments made during the quarter amounting to $8.9 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $0.6 million during the quarter, from $147.0 million at June 30, 2006 to $147.6 million at September 30, 2006. The increase was driven by increased reserves on certain credits within the U.S. public finance and structured finance portfolios, offset by a $35.6 million reduction in the ACR for Hurricane Katrina impacted credits. At September 30, 2006, the specific Hurricane Katrina-related provision amounts to $50.5 million, down from $90.4 million at June 30, 2006. The decrease is primarily due to significant state and federal support recently provided to the region, particularly the greater New Orleans area. Ambac did not pay any Katrina-related claims during the quarter.

Provision for income taxes for the third quarter of 2006 amounted to $83.6 million, an effective tax rate of 28.1%. This compares to the third quarter of 2005 tax provision of $51.9 million, an effective tax rate of 22.8%. The increased tax rate in 2006 was due to the net release of tax reserves in the third quarter 2005 and higher taxable income resulting from improved financial guarantee underwriting results in the third quarter 2006 relative to the comparable prior period primarily as a result of Hurricane Katrina related loss activity.

Provision for income taxes for the nine months of 2006 amounted to $252.5 million, an effective tax rate of 27.3%. This compares to the nine months of 2005 tax provision of $193.1 million, an effective tax rate of 26.1%. The increased tax rate in 2006 is explained above.

Other Items

Total net securities gains/(losses) for the third quarter of 2006 were $9.9 million, or $0.06 per diluted share; consisting of net realized gains on investment securities of $7.9 million, net mark-to-market gains on credit and total return derivatives of $2.1 million and net mark-to-market losses on non-trading derivative contracts of ($0.1) million. For the third quarter of 2005, net securities gains/(losses) were $14.5 million, or $0.08 per diluted share; consisting of net realized gains on investment securities of $9.5 million, net mark-to-market gains on credit and total return derivatives of $3.9 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million.

Total net securities gains/(losses) for the nine months of 2006 were $74.4 million, or $0.44 per diluted share; consisting of net realized gains on investment securities of $57.5 million, net mark-to-market gains on credit and total return derivatives of $16.5 million and net mark-to-market gains on non-trading derivative contracts of $0.4 million. Approximately $51 million of the net realized gains on investment securities relate to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the nine months of 2005, net securities gains were $53.1 million, or $0.27 per diluted share; consisting of net realized gains on investment securities of $10.8 million, mark-to-market losses on credit derivatives and total return swaps of ($7.0) million and net mark-to-market gains on non-trading derivative contracts of $49.3 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts in Ambac's investment agreement business that were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

Balance Sheet

Highlights

Total assets as of September 30, 2006 were $21.09 billion, up 7% from total assets of $19.73 billion at December 31, 2005. The increase was driven by cash generated from operations during the period.

As of September 30, 2006, stockholders' equity was $6.01 billion, a 12% increase from year-end 2005 stockholders' equity of $5.37 billion. The increase was primarily the result of net income during the period.

54.     The Individual Defendants caused the Company to issue a press release on January 31, 2007, announcing the financial results for Ambac's fourth quarter of 2006. The release stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced fourth quarter 2006 net income of $202.7 million, or $1.88 per diluted share. This represents a 1% decrease from fourth quarter 2005 net income of $204.3 million, or $1.90 per diluted share.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the fourth quarter 2006, net security gains and losses had the effect of increasing net income by $3.6 million, or $0.04 on a per diluted share basis. Other items during the fourth quarter 2006 had a net income effect of ($3.9) million, ($0.04) on a per diluted share basis, and represents the write-off of previously deferred issuance expenses related to debentures that were redeemed in October 2006. Accelerated earnings had the effect of increasing net income by $18.1 million, or $0.17 per diluted share for the fourth quarter 2006.

*        *        *

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "I am satisfied with our overall business results for the quarter and for the full year. Despite one of the most difficult business environments the industry has faced in many years, Ambac's full-year top line production is very acceptable. Most gratifyingly, our record-level full-year international production demonstrates our success in expanding our global reach, as our triple-A financial strength and reputation for innovative and efficient execution is now firmly planted across a broad segment of the international markets."

Revenues

Highlights

Credit enhancement production in the fourth quarter of 2006 was $314.5 million, down 21% from the fourth quarter of 2005 which came in at $395.8 million. Growth in international was more than offset by declines in U.S. public finance and U.S. structured finance.

Credit enhancement production for the full year of 2006 of $1,295.2 million was 4% higher than credit enhancement production of $1,249.4 million in 2005, as significant growth in international business more than offset the decline in the U.S. public finance business.

\*     \*     \*

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $84.2 million during the fourth quarter of 2006 from $126.7 million at September 30, 2006 to $42.5 million at December 31, 2006. The decrease was driven by the settlement of several impaired transactions during the quarter including a health care transaction that had been fully-reserved. Total claim payments during the quarter amounted to $68.8 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. Ambac continuously monitors its insured portfolio actively seeking to mitigate claims. The ACR increased by $25.0 million during the quarter, from $147.6 million at September 30, 2006 to $172.6 million at December 31, 2006. The increase was driven primarily by net increases in reserves on certain credits within the U.S. public finance portfolio, most notably within the transportation sector. At December 31, 2006, the specific Hurricane Katrina-related provision amounts to $50.1 million, down slightly from $50.5 million at September 30, 2006. Ambac did not pay any Katrina-related claims during the year.

Other Items

Total net securities gains/(losses) for the fourth quarter of 2006 were $5.8 million, or $0.04 per diluted share; consisting of net realized gains on investment securities of $9.6 million, net mark-to-market losses on credit and total return derivatives of ($4.8) million and net mark-to-market gains on non-trading derivative contracts of $1.0 million. For the fourth quarter of 2005, net securities gains/(losses) were $20.0 million, or $0.12 per diluted share; consisting of net realized losses on investment securities of ($2.2) million, net mark-to-market gains on credit and total return derivatives of $22.0 million and net mark-to-market gains on non-trading derivative contracts of $0.2 million.

Total net securities gains/(losses) for the full year of 2006 were $80.2 million, or $0.48 per diluted share; consisting of net realized gains on investment securities of $67.1 million, net mark-to-market gains on credit and total return derivatives of

$11.6 million and net mark-to-market gains on non-trading derivative contracts of $1.5 million. Approximately $56 million of the net realized gains on investment securities in 2006 relate to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in 2002 and 2003. For the full year of 2005, net securities gains were $73.1 million, or $0.40 per diluted share; consisting of net realized gains on investment securities of $8.6 million, mark-to-market gains on credit derivatives and total return swaps of $15.0 million and net mark-to-market gains on non-trading derivative contracts of $49.5 million. The mark-to-market gains on non-trading derivative contracts relate almost entirely to interest rate hedge contracts in Ambac's investment agreement business that were redesignated to meet the technical requirements of FAS 133 as of July 1, 2005.

Balance Sheet

Highlights

Total assets as of December 31, 2006 were $20.27 billion, up 9% from total assets of $18.55 billion at December 31, 2005. The increase was driven primarily by cash generated from operations during the period.

As of December 31, 2006, stockholders' equity was $6.18 billion, a 15% increase from year-end 2005 stockholders' equity of $5.38 billion. The increase was primarily the result of net income during the period.

55.     On February 7, 2007, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Financial Group, Inc. Announces Proposed Offering of Directly-Issued Subordinated Capital Securities."  The release stated in pertinent part:

Ambac Financial Group, Inc. today announced its plan to conduct a public offering of approximately $400 million Directly-Issued Subordinated Capital Securities (DISCS(SM)). The DISCS are expected to be rated Aa3 by Moody's Investors Service, Inc. and A+ by Standard & Poor's Ratings Services.

The Company currently intends to use the proceeds to repurchase shares of its common stock pursuant to an accelerated share repurchase program, subject to market and other business conditions. Any proceeds not used for such share repurchases are intended to be used for general corporate purposes.

Citigroup Corporate and Investment Banking, Goldman Sachs & Co. and JPMorgan will act as joint book-running managers for the DISCS underwriting syndicate.

The proposed offering would be conducted via an existing effective shelf registration statement. This press release shall not constitute an offer to sell, or the

- 40 -

solicitation of an offer to buy, any securities, nor shall there be any sale of securities mentioned in this press release in any state in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state. The offering of the DISCS will be made only by means of a prospectus and a related prospectus supplement.

56.    Then on February 12, 2007, the Individual Defendants caused the Company to issue a

press release indicating that the offer of February 7, 2007 was closed.  The release stated in pertinent

part:

Ambac Financial Group, Inc. today announced the closing of 6.15% $400 million Directly-Issued Subordinated Capital Securities (DISCS(SM)). The DISCs were sold at a discount to par to yield 6.199%.

Ambac will use all of the net proceeds from the offering and additional funds to purchase $400 million worth of shares of its common stock. The common stock will be purchased through an accelerated share repurchase agreement. The specific number of shares to be repurchased is generally based on the volume-weighted average share price of the Company's common shares during the term of the accelerated repurchase agreement. Based on current share price, the $400 million share buyback represents approximately 4.3% of the Company's market capitalization.

Sean Leonard, Chief Financial Officer, stated "Issuance of the subordinated capital securities in combination with the share repurchase program achieves the objective of further optimizing Ambac's capital structure by lowering the overall cost of capital. Importantly, we will improve return on equity and earnings per share measures without reducing our claims-paying resources."

57.    On April 25, 2007, the Individual Defendants caused Ambac to issue the financial

results for the first quarter of 2007.  The release, entitled "Ambac Financial Group, Inc. Announces

First Quarter Net Income of $213.3 Million, Down 4%," stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced first quarter 2007 net income of $213.3 million, or $2.02 per diluted share. This represents a 4% decrease from first quarter 2006 net income of $221.1 million, and a 2% decrease in net income per diluted share from $2.06 a year earlier.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly

GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the first quarter 2007, net security gains and losses had the effect of increasing net income by $2.5 million, or $0.02 on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $24.7 million, or $0.24 per diluted share during the quarter.

* * *

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "The first quarter evidenced improved business production across all major business sectors relative to the 2006 comparable quarter. Debt issuance and capital markets activity continues to be strong. Importantly, recent evidence of credit spread widening in the mortgage related asset classes should lead to increased demand for our core financial guarantee product, provided of course, that wider spreads continue to prevail."

Revenues

Highlights

Credit enhancement production in the first quarter of 2007 was $310.1 million, up 33% from $233.5 million reported in the first quarter of 2006. Growth was achieved in all three sectors, led by the 49% increase in U.S. structured finance.

* * *

Reinsurance Cancellations

During the first quarter 2006, Ambac cancelled its remaining reinsurance contracts with two reinsurers and recaptured $3.9 billion of par outstanding. Included in ceded premiums in our Consolidated Statement of Operations is $37.0 million in returned premiums from the cancellations, of which approximately $29.3 million was deferred. The difference, $7.7 million, included in accelerated premiums, resulted from the difference between the contractual amount of returned premiums and the associated unearned premium remaining on the previously ceded portion of the underlying guarantees. The net income impact of the cancellations, presented in Table I, above, as part of accelerated premiums, amounted to approximately $2.0 million, or $0.02 per diluted share.

*     *     *

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) decreased $4.8 million during the first quarter of 2007 from $42.5 million at December 31, 2006 to $37.7 million at March 31, 2007. The decrease was driven by improving conditions on certain credits for which we had previously paid claims. Total net claim payments during the quarter amounted to ($0.1) million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR increased by $16.2 million during the quarter, from $172.6 million at December 31, 2006 to $188.8 million at March 31, 2007. The increase was driven primarily by net increases in reserves on certain credits within the U.S. public finance portfolio.

Other Items

Total net securities gains/(losses) for the first quarter of 2007 were $3.7 million, consisting of net realized gains on investment securities of $6.6 million, net mark-to-market losses on credit and total return derivatives of ($1.9) million and net mark-to-market losses on non-trading derivative contracts of ($1.0) million. Approximately $6.2 million of the net realized gains on investment securities relate to cash recoveries received during the quarter related to a security in the investment agreement portfolio that had recognized impairment losses in prior years. For the first quarter of 2006, net securities gains/(losses) were $13.4 million, consisting of net realized gains on investment securities of $5.1 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market gains on non-trading derivative contracts of $1.1 million.

Balance Sheet

Highlights

Total assets as of March 31, 2007 were $20.11 billion, down 1% from total assets of $20.27 billion at December 31, 2006. The decrease was primarily driven by a net draw down from our investment agreement portfolio, partially offset by cash generated from operations during the period.

On February 12, 2007, Ambac issued $400 million of Directly-Issued Subordinated Capital Securities (DISCS(SM)). Ambac used the net proceeds from the offering and additional funds to purchase $400 million worth of shares of its common stock. The common stock was purchased through an accelerated share buyback agreement and resulted in 4.26 million shares acquired during the quarter. The total number of additional shares that will ultimately be repurchased under the

program will be based on the volume-weighted average share price of the Company's common shares during the term of the accelerated buyback agreement.

As of March 31, 2007, stockholders' equity was $5.99 billion, a 3% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback, partially offset by net income during the period.

58.     The news that Ambac had weathered the deteriorating housing and credit markets with only a 3% decrease in stockholder equity (explained away as the result of the February share buyback, not market conditions) while also only decreasing net income only 2% from the previous year was music to the ears of investors. The price per share of Ambac continued to rise from a close of $90.01 per share on April 24, 2007 to an all-time high of $96.08 on May 18, 2007.

## THE INDIVIDUAL DEFENDANTS SLOWLY DISCLOSE THE TRUTH

59.     On July 25, 2007 the Individual Defendants caused the Company to issue a press release entitled "Ambac Financial Group, Inc. Announces Second Quarter Net Income of $173.0 Million, down 27%, Second Quarter Net Income Per Diluted Share of $1.67, down 25%, Second Quarter Credit Enhancement Production $367.8 million, down 31%." The release stated in pertinent part:

Ambac Financial Group, Inc. (Ambac) today announced second quarter 2007 net income of $173.0 million, or $1.67 per diluted share. This represents a 27% decrease from second quarter 2006 net income of $238.6 million, and a 25% decrease in net income per diluted share from $2.22. The decrease is primarily due to unrealized mark-to-market losses amounting to ($56.9) million, or ($0.36) per diluted share, related to credit derivative exposures in the second quarter 2007. The comparable quarter of 2006 included net realized gains on investment securities of $44.4 million, or $0.27 per diluted share, primarily resulting from cash recoveries received related to a security in the investment agreement portfolio that had been written down in prior years. The second quarter 2007 unrealized mark-to-market losses on credit derivative exposures is the result of unfavorable market pricing of collateralized debt obligations with significant amounts of sub-prime residential mortgage collateral. As further described below, net mark-to-market gains and losses on credit derivatives and net gains and losses from sales of investment securities are excluded from the earnings measures used by research analysts.

Net Income Per Diluted Share

Net income and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.

Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the second quarter 2007, net security gains and losses had the effect of decreasing net income by ($34.6) million, or ($0.34) on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $25.6 million, or $0.25 per diluted share during the quarter.

\*       \*       \*

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "We are pleased with the breadth and quality of our business production in the quarter. Our rigorous and proven approach enabled us to deliver positive results despite the turmoil in the sub-prime mortgage market that resulted in a negative mark-to-market adjustment. Our triple-A business model offers us key advantages, including our ability to hold insured transactions to maturity; no collateral or margin requirements on transactions insured; and, in the unlikely event of default we pay scheduled principal and interest, thereby minimizing liquidity risk." Mr. Genader added, "Looking ahead, the disciplined execution of our strategy positions us well to benefit from the improving business conditions we see, with wider spreads, enhanced credit terms and increased demand for our valuable financial guarantee products."

Revenues

Highlights

Credit enhancement production in the second quarter of 2007 was $367.8 million, down 31% from Ambac's record quarterly production of $531.0 million reported in the second quarter of 2006. Credit enhancement production for the six months of 2007 of $677.9 million was 11% lower than credit enhancement production of $764.4 million in the same period of 2006.

\*       \*       \*

Public finance earned premiums, before accelerations, grew 2% this quarter. Earned premium growth in this sector has been negatively impacted by the high level of refunding activity in Ambac's public finance book in recent years, competitive pricing and the mix of business underwritten in recent periods.

Structured finance earned premiums and other credit enhancement fees grew 10%. The rate of growth in structured finance has improved recently, driven by strong premium production in asset classes such as pooled debt obligations and commercial asset-backed securities over the past several quarters.

International earned premiums and other credit enhancement fees decreased 2%. The decrease has resulted from deal terminations and a slow down in deal closings in 2007 relative to the prior year.

Net investment income for the second quarter of 2007 was $113.2 million, representing an increase of 8% from $104.5 million in the comparable period of 2006. This increase was due primarily to growth in the investment portfolio driven by the ongoing collection of financial guarantee premiums and fees.

Net investment income for the six months of 2007 was $225.3 million, representing an increase of 9% from $206.2 million in the comparable period of 2006, primarily as a result of the reasons provided above.

Financial services revenues. The financial services segment is comprised of the investment agreement business and the derivative products business. Gross interest income less gross interest expense from investment and payment agreements plus results from the derivative products business, excluding net realized investment gains and losses and unrealized gains and losses on total return swaps and non-trading derivative contracts, was $9.2 million in the second quarter of 2007, down 15% from $10.8 million in the second quarter of 2006. The decrease was primarily due to lower revenue from the interest rate swap, total return swap and investment agreement businesses in the second quarter 2007.

Financial services revenues were $19.9 million in the first half of 2007, down 12% from the $22.5 million of revenues in the first half of 2006 primarily due to the reason provided above.

Expenses

Highlights

Financial guarantee expenses of $50.5 million for the second quarter of 2007 increased 13% from $44.7 million of expenses for the second quarter of 2006. Financial guarantee loss and loss expenses were $17.1 million in the second quarter of 2007, up from $12.8 million in the second quarter of 2006. See "Loss Reserve Activity," below, for additional information on losses. Net underwriting and operating expenses of the financial guarantee sector totaled $33.4 million in the

second quarter of 2007, up 5% from $31.9 million in the second quarter of 2006 primarily due to increased compensation expense.

Financial guarantee expenses of $98.3 million for the first six months of 2007 increased 19% from $82.7 million of expenses for the same period of 2006. The increase results primarily from higher loss expenses during the period.

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $9.6 million during the second quarter of 2007 from $37.7 million at March 31, 2007 to $47.3 million at June 30, 2007. Included in the March 31, 2007 case reserves balance were offsetting receivables for claims previously paid on a European transportation transaction that were deemed by management to be recoverable upon the anticipated successful restructuring of that transaction. The restructuring was finalized during the quarter and the payments due to Ambac were received. Total net claim payments/(receipts) during the quarter amounted to ($7.5) million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR increased by $14.9 million during the quarter, from $188.8 million at March 31, 2007 to $203.7 million at June 30, 2007. The increase was driven primarily by increases in reserves on certain credits primarily within the transportation sector of the U.S. public finance portfolio and to a lesser extent within the non-subprime RMBS sector of the structured finance portfolio, partially offset by favorable credit activity throughout both portfolios.

Other Items

Total net securities gains/(losses) for the second quarter of 2007 were ($52.7) million, consisting of net realized gains on investment securities of $1.2 million, net mark-to-market losses on credit and total return derivatives of ($57.9) million and net mark-to-market gains on non-trading derivative contracts of $4.0 million. During the quarter a net mark-to-market loss amounting to ($56.9) million was recorded related to insured collateralized debt obligations of asset-backed securitizations containing sub-prime mortgage-backed securities as collateral. The negative mark-to-market is driven by current market concerns over the most recent vintages of subprime RMBS and the recent lack of liquidity in the CDO of ABS market resulting in a reduction in market-quoted prices. Ambac's exposure on those transactions all attach at levels senior to the triple-A attachment points as established by the rating agencies.

For the second quarter of 2006, net securities gains/(losses) were $51.0 million, consisting of net realized gains on investment securities of $44.4 million, net mark-to-market gains on credit and total return derivatives of $7.2 million and net mark-to-market losses on non-trading derivative contracts of ($0.6) million. Approximately $38 million of the second quarter 2006 net realized gains on

investment securities related to cash recoveries received from a security in the investment agreement portfolio that had been written down in previous years.

Total net securities gains/(losses) for the first half of 2007 were ($49.0) million, consisting of net realized gains on investment securities of $7.8 million, net mark-to-market losses on credit and total return derivatives of ($59.8) million and net mark-to-market gains on non-trading derivative contracts of $3.0 million. For the first half of 2006 net securities gains were $64.4 million, consisting of net realized gains on investment securities of $49.5 million, net mark-to-market gains on credit and total return derivatives of $14.4 million and net mark-to-market gains on non-trading derivative contracts of $0.5 million.

Balance Sheet

Highlights

Total assets as of June 30, 2007 were $21.06 billion, up 4% from total assets of $20.27 billion at December 31, 2006. The increase was primarily driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio due to a rise in long-term interest rates.

As of June 30, 2007, stockholders' equity was $6.04 billion, a 2% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback and lower Accumulated Other Comprehensive Income driven by higher long-term interest rates, partially offset by net income during the period.

During the second quarter 2007, Ambac completed the buyback of $400 million of its common stock under its accelerated share buyback program (originally announced on February 12, 2007). The total number of shares purchased under the agreement amounted to 4.46 million shares. Ambac also bought back 194 thousand shares of its common stock at a total cost of $16.9 million during the second quarter that was unrelated to the accelerated share buyback program.

60.    Upon this partial disclosure on July 26, 2007, Ambac's stock decreased by $3.85 per share to close at $75.56 per share, a one-day decline of 5% on volume of 4 million shares, three times the average three-month volume.  The shares would maintain this steady decline during the next week, closing at $62.42 on August 3, 2007 -- nine days after the release.

61.    On October 10, 2007, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Financial Group, Inc. Announces Estimate of Unrealized Mark-to-Market Loss on Its Credit Derivatives Portfolio."  The press release stated in part:

Ambac Financial Group, Inc. (Ambac) today announced the results of its third quarter fair value review of its outstanding credit derivative contracts. ***Ambac's estimate of the fair value or "mark-to-market" adjustment for its credit derivative portfolio at September 30, 2007 amounted to an unrealized loss of $743 million, pre-tax***. The company expects to report a net loss per diluted share up to $3.50 in the third quarter. Earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts, as well as certain other items. The company expects to report positive operating earnings per diluted share between $1.85 and $1.90 in the third quarter.

Commenting on the estimated result, Ambac Chairman and Chief Executive Officer, Robert J. Genader, stated, "While this unrealized loss is disappointing, it is important to note that Ambac's credit derivative contracts are similar to our insurance policies in that neither is exposed to the liquidity risks that are typically embedded in standard derivative contracts." Mr. Genader added, "While the turmoil in the structured finance markets has resulted in this unfavorable unrealized mark-to-market for the quarter, we have observed significantly improved market conditions for the industry and I am encouraged by the recent increased interest in our core financial guaranty product. Moreover, I remain confident in our underwriting abilities, credit standards and the transactions we have insured."

Ambac Senior Vice President and Chief Financial Officer, Sean Leonard, noted, "Ambac does not view the current adjustments as predictive of future claims. Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our recent analysis of the portfolio, management believes that the potential for material paid claims is very low. Importantly, the company's claims paying resources, as prescribed by the rating agencies, are not impacted by mark-to-market adjustments."

The company also expects to report the following for the third quarter of 2007: (i) loss provision of approximately $20 million; (ii) estimated accelerated premiums from refundings, calls and other accelerations of approximately $16 million; (iii) credit enhancement production of approximately $430 million; and (iv) Ambac's highly rated investment portfolios, which total to approximately $19 billion, are expected to have net embedded unrealized gains of approximately $100 million as of September 30, 2007.

***Ambac is providing this preliminary information about its third quarter results prior to the scheduled earnings announcement date in light of the extreme market events of recent months***. Investors should not expect the company to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates. In addition, investors should not expect the company to update the information provided in this release in advance of the scheduled announcement date for its third quarter.

62.    Upon this additional partial disclosure, Ambac's stock gradually yet significantly deteriorated from a closing price of $68.65 per share on October 9, 2007 to close at $55.90 per share on October 23, 2007.  This steady two-week decline resulted in a loss of nearly 19% of the Company's stock value.

63.    The Individual Defendants caused the Company to issue a press release on October 24, 2007 entitled "Ambac Financial Group, Inc. Announces Third Quarter Net Loss of ($360.6) Million; Includes Previously Announced $743 Million Unrealized Mark-to-market Loss on Credit Derivative Portfolio." The press release stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) today announced a third quarter 2007 net loss of ($360.6) million, or ($3.51) per diluted share. This compares to third quarter 2006 net income of $213.5 million, or net income per diluted share of $1.98. The decrease is due to the previously announced unrealized loss on credit derivative exposures amounting to ($743.4) million, or ($5.29) per diluted share in the third quarter 2007. The third quarter 2007 unrealized mark-to-market loss on credit derivative exposures was discussed in a press release dated October 10, 2007, and is primarily the result of unfavorable market pricing of collateralized debt obligations. As further described below, net mark-to-market losses on credit derivatives are excluded from the earnings measures used by research analysts.
>
> Net Income/(Loss) Per Diluted Share
>
> Net income/(loss) and net income/(loss) per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides other information.
>
> Earnings measures reported by research analysts exclude the net income impact of net gains and losses from sales of investment securities and unrealized mark-to-market gains and losses on credit, total return and non-trading derivative contracts (collectively "net security gains and losses") and certain other items. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During the third quarter 2007, net security gains and losses had the effect of decreasing net income by ($553.5) million, or ($5.39) on a per diluted share basis. Accelerated earnings had the effect of increasing net income by $9.6 million, or $0.10 per diluted share during the quarter.

*      *      *

Commenting on the overall results, Ambac Chairman and Chief Executive Officer, Robert J. Genader, noted, "We have observed improved overall market conditions in most asset classes of our core financial guaranty product, despite the recent turmoil in the structured finance markets. Business production during the quarter was quite robust, reflective of both a strong pipeline and better overall pricing in the current market." Mr. Genader added, "With regard to the sizable mark-to-market adjustment recorded in the quarter, it is important to note that Ambac's credit derivative contracts, like our insurance policies, are not exposed to the type of liquidity risk that is typically embedded in standard derivative contracts."

Revenues

Highlights

Credit enhancement production in the third quarter of 2007 was $431.1 million, up 99% from Ambac's production of $216.2 million reported in the third quarter of 2006.

Credit enhancement production for the nine months of 2007 of $1,109.1 million was 13% higher than credit enhancement production of $980.7 million in the same period of 2006.

*      *      *

Loss Reserve Activity

Case basis loss reserves (loss reserves for exposures that have defaulted) increased $59.8 million during the third quarter of 2007 from $47.3 million at June 30, 2007 to $107.1 million at September 30, 2007. The increased case reserves relate primarily to two RMBS transactions that are underperforming original expectations. Total net claim receipts during the quarter amounted to $3.7 million.

Active credit reserves ("ACR") are established for probable and estimable losses due to credit deterioration on certain adversely classified insured transactions. The ACR decreased by $37.0 million during the quarter, from $203.7 million at June 30, 2007 to $166.7 million at September 30, 2007. The reserve decline was driven by net favorable credit activity, primarily within the public finance portfolio, partially offset by increased reserves within the RMBS sector of the structured finance portfolio.

Other Items

Total net securities gains/(losses) for the third quarter of 2007 were ($757.2) million, consisting of net realized gains on investment securities of $4.2 million, ***net mark-to-market losses on credit and total return derivatives of ($756.3) million and***

*net mark-to-market losses on non-trading derivative contracts of ($5.1) million. During the quarter a net mark-to-market loss amounting to ($743.4) million was recorded related to contracts executed in credit default format, primarily in our collateralized debt obligation exposures*. The negative mark-to-market is driven by dramatically lower prices in certain structured finance asset classes. The lower prices were driven by uncertainty regarding the ultimate outcome of subprime losses. Reduced demand for certain structured asset classes, a lack of liquidity in the markets, forced selling by structured and/or leveraged investment vehicles, all combined to exacerbate pricing declines across the structured debt capital markets.

For the third quarter of 2006, net securities gains/(losses) were $9.9 million, consisting of net realized gains on investment securities of $7.9 million, net mark-to-market gains on credit and total return derivatives of $2.1 million and net mark-to-market losses on non-trading derivative contracts of ($0.1) million.

Total net securities gains/(losses) for the first nine months of 2007 were ($806.0) million, consisting of net realized gains on investment securities of $12.0 million, net mark-to-market losses on credit and total return derivatives of ($816.0) million and net mark-to-market losses on non-trading derivative contracts of ($2.0) million. For the first nine months of 2006 net securities gains were $74.4 million, consisting of net realized gains on investment securities of $57.5 million, net mark-to-market gains on credit and total return derivatives of $16.5 million and net mark-to-market gains on non-trading derivative contracts of $0.4 million. Approximately $51 million of the 2006 net realized gains on investment securities related to cash recoveries received during the year related to a security in the investment agreement portfolio that had been written down in previous years.

Balance Sheet

Highlights

Total assets as of September 30, 2007 were $21.97 billion, up 8% from total assets of $20.27 billion at December 31, 2006. The increase was primarily driven by cash generated from operations during the period, partially offset by a decrease in unrealized gains in the investment portfolio due to a rise in long-term interest rates.

As of September 30, 2007, stockholders' equity was $5.65 billion, a 9% decrease from year-end 2006 stockholders' equity of $6.18 billion. The decrease was primarily the result of the $400 million share buyback earlier in the year and lower Accumulated Other Comprehensive Income driven by higher long-term interest rates.

64.    Following this additional partial disclosure on October 24, 2007, Ambac's stock fell

$4.90 per share to close at $51.00 per share, a one-day decline of 9% on volume of 10.8 million

shares, three times the average three-month volume.  Ambac's stock continued its free-fall the

following day as the news continued to seep into the market, closing down another $7.05 per share to close at $43.95 per share, a one-day decline of 14% on volume of 16.4 million shares, over four times the average three-month volume. In total, upon this revelation, Ambac's stock closed down $11.95 per share, a two-day decline of 21% on extremely high volume.

65.    In the following weeks, the truth about Ambac's financial and business outlook persistently leaked out into the public. As the full truth became more evident, the air kept escaping from the Company's artificially inflated stock. From October 24, 2007, the date of the disclosure of the Third Quarter loss of Ambac, the stock price tumbled downward at a steady pace from $51.00 per share to $24.60 on November 5, 2007, losing over half of its value.

(a)    On October 26, 2007, Moody's cut the ratings on CDOs tied to $33 billion of subprime mortgage securities. In some cases, CDOs with ratings as high as AAA were either cut or put on review for downgrade.

(b)    On October 29, 2007, Fitch announced that it had completed a comprehensive review of its CDOs and as a result it was placing 150 transactions tied to $36.8 billion on Ratings Watch Negative, including CDOs with AAA ratings. The following day, Fitch announced that it would be revising its entire methodology for rating CDOs and indicated that it expected to publish the new methodology the following week.

(c)    On November 1, 2007, Ambac's bonds were downgraded to "deteriorating" from "stable" by bond research firm Gimme Credit Publications Inc. due to Ambac's exposure to CDOs. The downgrade was based upon the recent ratings cuts made by the credit-ratings companies for the mortgage-backed bonds and CDOs. As *Bloomberg* reported:

> Ambac Financial Group Inc. bonds were downgraded to ``deteriorating'' from ``stable'' by Gimme Credit Publications Inc. because of the world's second-largest bond insurer's risk from collateralized debt obligations.

\*      \*      \*

"The sharp drop in the stock price at MBIA and Ambac raises questions about whether the turmoil in the markets is hurting franchise value,'' said Kathleen Shanley, an analyst [in Chicago] at [bond research firm] Gimme Credit, in an e-mail. ``The financial guaranty business relies heavily on the confidence of investors that the guarantees will be money-good, and if clients begin to doubt this premise, there will be negative implications for the new business outlook going forward."

Ambac has insured about $29 billion of CDOs whose assets are more than a quarter mortgage-backed securities, ``relatively more'' than MBIA, . . . Gimme Credit said in a report today. CDOs are created by packaging bonds, loans or derivatives and using their income to pay investors.

Ratings Cut

About 97 percent of New York-based Ambac's $71.5 billion CDO portfolio was rated AA or better as of Oct. 23 and ratings cuts are likely given the slew of mortgage-backed bond and CDO downgrades by the credit-ratings companies, Gimme Credit said.

Standard & Poor's, Moody's Investors Service and Fitch Ratings have cut ratings almost 7,800 times on bonds backed by residential mortgage-backed securities from 2006, Fitch said this week. Another 3,700 cuts by the ratings companies came from bonds sold in 2005 and this year, Fitch said.

(d)     Upon this news, Ambac's shares lost another $7.26 per share to close at $29.57 per share, a one-day decline of 20% on volume of 23.7 million shares, over 5.5 times the average three-month volume.

(e)     On November 2, 2007, Morgan Stanley lowered the financial guarantee industry from "attractive" to "in-line" and Goldman Sachs cuts its rating on Ambac from "buy" to "neutral."   The Morgan Stanley report raised concerns that additional losses at Ambac could force the Company to raise capital to protect its AAA rating.

(f)     Upon this news, Ambac's shares collapsed losing another $6.06 per share to close at $23.51 per share, a one-day decline of 20.5% on volume of 29.9 million shares, over 7 times the average three-month volume.

(g)     On November 5, 2007, Fitch announced its new methodology in assessing financial guarantors CDOs and further announced that it would be reviewing the capital of the monolines, including Ambac, to ensure that they have enough capital to warrant their AAA rating. As a result of the ongoing review, Ambac faced a "moderate" risk of falling beneath the capital requirements necessary to keep its AAA rating, which would result in either a potential ratings downgrade or forcing the Company to raise more capital.  The review was expected to last six weeks.

66.     Due to the steady and rapid deterioration of Ambac's artificially inflated stock value, the Individual Defendants caused the Company to issue a press release on November 6, 2007, entitled "Ambac's Response to Morgan Stanley's Report On Financial Guarantors – Dated November 2, 2007," which stated in pertinent part:

**"Questions Arise on Mark to Market Losses"**

On page 6 the analyst states, "One of the first negative surprises we saw last week stemmed from the large discrepancy between the mark-to-market losses reported by the financial guarantors and Merrill Lynch."

**Management Comment**:

It is difficult for us to comment on the Merrill Lynch mark-to-market loss as we do not have any visibility into their transactions. Without such details on Merrill's book, one can only speculate as to the differences in the portfolios.

Several differences may exist between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios. For example, we have noted that later vintage high-grade ABS CDOs (particularly those with 2007 and late 2006 vintage underlying collateral) and high-grade ABS CDOs that have large inner CDO components, have suffered more severe mark-to-market losses. Additionally, as one might expect, the amount of first loss subordination and credit migration triggers present in a structure also can impact the market value of the senior tranche. Finally, the terms of the contract may also impact the estimate of fair value. Ambac's Credit Default Swap ("CDS") contracts are highly modified from a standard CDS used by investment banks. Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal. Ambac's

contract terms are significant variations from standard CDS contracts and have significant value, particularly in difficult markets. In fact, certain investment banks will not enter into an Ambac CDS due to the favorable nature (towards Ambac) of its terms.

Some background on Ambac's mark-to-market follows. The mark-to-market unrealized loss is an estimate of our CDS contracts' "fair value". It is an estimate because our CDS contract does not trade in any market. Under U.S. generally accepted accounting principles, CDS contracts must be recorded at fair value. Fair value is defined broadly as the price that a contract could be settled in a current transaction between willing parties, other than in a forced or liquidation sale.

Because an estimate of fair value of a CDS contract includes many market factors, an unrealized loss may not result in an increased expectation of loss. A good example of this dynamic is a general decline in the level of liquidity (witnessed by fewer buyers in the market) for a particular asset or asset class. Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

Most all-major financial institutions are struggling with this issue. Particularly institutions where the process of marking-to-market is a critical part of operations, such as those that need to calculate required collateral postings. We are subject to information that we receive from market participants, which are primarily comprised of major investment banking institutions. Given the lack of liquidity in the market, the potential for CDO downgrading activity by the rating agencies, the potential for forced selling by other investors (due to downgrades), and the overall uncertainty surrounding the ultimate outcome of the sub prime mortgage market, Ambac does expect significant volatility in the mark-to-market of its CDO portfolio for the foreseeable future.

**"CDO Downgrades Have Started"**

On pages 6 and 7, the analyst discusses the recent internal rating downgrades of certain ABS CDOs. He states "If they were to downgrade the securities further, we would be highly disappointed and expect investor confidence in management to be strained."

**Management Comment**:

Ambac has a rigorous surveillance process surrounding its entire book of business. Management has subjected the mortgage and ABS CDO books to more frequent and more detailed reviews in the current environment. We believe this is prudent and responsible given the current stressed credit environment surrounding the mortgage market. While Ambac underwrites its transactions to withstand significant stress, the underlying credit rating is impacted by expected unfavorable

- 56 -

collateral performance. To date, the downgrades noted in the subject transactions are within the parameters of Ambac's original stress tests. Ambac's independent Surveillance and Risk Management group determine the deal ratings. The ratings are based on the performance observed to date and a projection of future performance of the underlying collateral. Given the significant stress in the mortgage market, it should not be surprising that there have been downgrades. We are highly confident in our ratings process. Over time, as new information becomes available and as performance data is analyzed, we will adjust ratings up or down accordingly.

**"Increasing Our Expectation of CDO Losses"**

The analyst states, "We are increasing our CDO loss expectations for both Ambac and MBIA to reflect an updated tally of various market opinions about cumulative sub prime losses."

**Management Comment**:

It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime. It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book. We see wide differences in the market regarding the estimate of ultimate cumulative loss for the 2006 and early 2007 vintage. We typically hear a range from 8% to 17% with a wide dispersion around the mean. We understand the three major rating agencies are projecting a range of 10% to 14%. One of the rating agencies recently reported estimates with significant differences dependent upon vintage. There were notable differences between the first half of 2006 and more recent vintages. We believe this is a critical point that is missed by simply applying a broad 15% estimated cumulative loss across the book of business. It does not compensate for vintage dispersion inherent in our transactions, nor does it factor in different rating and FICO segmentation. Additionally, many of the ABS CDOs contain 2005 vintage mortgages, including Ambac transactions that were underwritten in 2007. That vintage is performing significantly better than 2006 and 2007. This illustrates the over simplification of applying a single cumulative loss across the board.

**"Becoming More Conservative with Capital"**

The analyst states, "We can not help but think that if management truly believed losses are unlikely, they would be willing to make a stronger statement with how they manage their capital (i.e. increased share buybacks)."

**Management Comment**:

As management has stated many times in the past, Ambac manages its capital levels to a triple-A standard. That requires us to be very cautious with capital levels, particularly in times of credit stress. For instance, a transaction rated AA will attract

more capital than a similar transaction rated AAA. It is unlikely claims will be paid under either transaction. The global capital markets and virtually all major financial institutions are in the midst of a major credit and liquidity crunch. There is uncertainty regarding the ultimate outcome of losses in the U.S. mortgage market, concerns over leveraged investment vehicles and overall concern that the problems surrounding the mortgage market will adversely impact other sectors of the economy. Such an environment has caused credit spreads in many sectors to widen significantly. This environment provides both opportunities and limitations for Ambac. With regard to opportunities, returns on business written are up sharply in many sectors and we have seen a notable increase in attractive opportunities to put our capital to work for our shareholders. With regard to limitations, the market environment has caused some fixed income investors to have increased concern about the financial guaranty industry. As a result, all of the major participants in the industry have seen their credit spreads widen significantly. We believe applying capital to high return business and at the same time maintaining a stronger balance sheet by holding off on share repurchases is a responsible course in the current environment and one that meets our objective of managing our capital consistent with a triple-A standard. We believe this prudent strategy is good for both our equity and fixed income investors and will help restore confidence in our industry.

**Summary comments**:

We certainly understand the heightened concerns summarized in the analyst's report. Most all participants in the financial markets, including Ambac have a heightened concern over the ultimate outcome of the U.S. mortgage market. However, we are confident in the quality of our internal credit ratings process. We have been very transparent to the market and our investors by disclosing significant detail on our direct mortgage and CDO exposure in our various public disclosures. We have a rigorous and current review and rating process in place and we will react quickly as projected collateral performance changes.

67.    This release calmed the market somewhat and Ambac's stock closed on November 6, 2007 at $27.99 per share, up $3.39, or nearly 14%, from the previous day's close. The Individual Defendants had succeeded in keeping the truth from the investing public, stifling the steady decline of the stock's artificial value and yet again increasing the artificial value of Ambac stock.

68.    However, on November 8, 2007, Moody's announced that it intended to conduct a review of the capital of the monoline insurers similar to the review undertaken by Fitch. The announcement also indicated that as a result Ambac faced a "moderate" risk of falling behind the capital requirements and risked potential ratings downgrade.

69.     With the future rating of Ambac in question, the Individual Defendants caused certain executives to speak at a Banc of America Securities bond insurer conference on November 27, 2007. At the conference, Ambac announced that it was considering raising capital through reinsurance or sales of debt or stock in order to maintain the Company's AAA rating.

70.     Upon this news, Ambac's shares once again collapsed, losing another $2.23 per share to close at $21.79 per share, a one-day decline of 9.3% on volume of 12.3 million shares, approximately twice the average three-month volume. The price represented what was then the lowest closing price in Ambac's stock in over a decade.

71.     In mid-December, Moody's, Standard & Poor's, and Fitch came out with their review of Ambac's capital position.

On December 17, 2007, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Comments on Moody's Report on Capital - Ambac' Aaa Rating is Affirmed, Outlook Stable." The release stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) today said that Moody's Investors Service has completed its review of Ambac Assurance Corporation's capital position and has affirmed the Company's Aaa rating with a stable outlook. Chairman and CEO, Robert J. Genader, noted "Ambac is pleased by this result which underscores the strength of our portfolio. We are optimistic about the business opportunities ahead and we will strategically explore these opportunities while remaining absolutely committed to preserving our triple-A rating."
>
> According to the Moody's capital model, Ambac Assurance Corporation's capital position is sufficient under both base case and stressed credit scenarios to maintain its Aaa rating. Under Moody's model, Ambac's excess capital position (the amount of capital in excess of the minimum required to maintain a Aaa rating) remains substantial albeit down from year end 2006, resulting from Moody's downgrades of certain exposures related to subprime residential mortgage-backed securities.
>
> Ambac is investigating a number of solutions to expand its capital position. The Company will consider the results of its own ongoing evaluation of its capital position, the results of evaluations currently being performed by both

Standard & Poor's and Fitch, and the potential for future growth of its business in deciding upon capital expansion alternatives.

72.    On December 19, 2007, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Comments on Standard & Poor's Report on Capital - Ambac' AAA Rating is Affirmed, Outlook Changed to Negative."  The release stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) today said that Standard & Poor's Ratings Services ("S&P") has completed its review of Ambac Assurance Corporation's capital position and has affirmed the Company's AAA rating with a negative outlook. Chairman and CEO, Robert J. Genader, noted "We are satisfied with the AAA rating affirmation. We are confident the performance of our insured portfolio and the measures being taken to expand Ambac's capital position will be sufficient to return our outlook to stable." Mr. Genader added, "We expect the current environment of wide credit spreads to remain in place throughout 2008 and our triple-A rated claims-paying strength puts us in a unique position to capitalize on business opportunities in this environment."

> Ambac continues to investigate a number of solutions to expand its capital position. In determining the best capital expansion alternatives, Ambac will consider a number of factors including the results of its own ongoing evaluation, the results of the evaluations performed by each of the rating agencies, and the potential for future growth of its business.

73.    On December 20, 2007, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Comments on Fitch Report on Capital - Ambac's AAA Rating on Rating Watch Negative."  The release stated in pertinent part:

> Ambac Financial Group, Inc. (Ambac) announced today that Fitch Ratings ("Fitch") has completed its review of Ambac Assurance Corporation's capital position and has put the Company's AAA rating on 'rating watch negative'. Chairman and CEO, Robert J. Genader, noted "The Fitch announcement concludes this phase of the rating agencies' reviews. As previously stated, Ambac has been investigating solutions to expand its capital position. Between our own analysis and that of the rating agencies, we are now in a better position to make informed, disciplined decisions regarding the form and timing of capital expansion."

74.    Upon the news that Ambac would be retaining their AAA rating, even with reduced outlooks, the price of Ambac stock began to stabilize its most recent downturn and rise from $22.81

on December 14, 2007, the last day of trading before the Individual Defendants caused the Company to issue the first of the above press releases, to $27.70 on December 20, 2007.

75.    On December 21, Bloomberg.com published an article entitled "Ambac Ratings May Be Cut by Fitch on CDO Exposure."  The article stated in pertinent part:

>    Credit ratings for Ambac Financial Group Inc. were placed under review for a possible downgrade by Fitch Ratings, which said the world's second-largest bond insurer needs to raise $1 billion of capital.

>    Fitch cited the New York-based company's guarantees on about $32.2 billion of collateralized debt obligations with varying degrees of exposure to subprime mortgage assets, according to a statement today. Subprime loans, made to borrowers with poor credit, have been going delinquent at an unprecedented pace.

76.    On January 16, 2008, less than a month after the Individual Defendants caused Ambac to give a positive outlook on the prospects of retaining Ambac's AAA ratings, the Individual Defendants caused the Company to issue a press release entitled "Ambac announces Capital Enhancement Plan to Raise in Excess of $1 Billion."  This press release stated in pertinent part:

>    NEW YORK, Jan 16, 2008 (BUSINESS WIRE) -- Ambac Financial Group, Inc. (Ambac) today announced that its Board of Directors has approved a plan to strengthen its capital base through the issuance of at least $1 billion of equity and equity-linked securities. This plan may also include additional capital from reinsurance or issuance of debt securities. Ambac said that it is committed to maintaining its triple-A financial strength. By raising at least $1 billion in capital, Ambac is expected to meet or exceed Fitch Ratings' current triple-A capital requirements for the Company. The Company noted that its existing capital position currently meets or exceeds the triple-A capital requirements of both S&P and Moody's. As part of its capital initiative, Ambac also said that it will reduce the quarterly dividend on its common stock from $0.21 per share to $0.07 per share.

>    Management Change

>    Ambac's Board of Directors announced today that it has named Michael A. Callen as Chairman and Interim Chief Executive Officer. Mr. Callen has been Presiding Director and a member of the Audit and Risk Assessment; Compensation; and Governance committees of Ambac's Board of Directors. He succeeds Robert J. Genader, who will retire from the Company effective today. "Mike has extensive experience in advising and leading companies engaged in sophisticated capital markets transactions, and he will

provide valuable leadership to the excellent management team at Ambac," said Jill Considine, Chairman of the Board's Governance Committee. Ms. Considine commented further, "On behalf of the Board and everyone at Ambac, I would like to thank Bob Genader for his more than 20 years of dedication to Ambac. He has served the Company in almost every capacity throughout his long career, and has been a true asset. Indeed, one of the most important testaments to his leadership is the highly-qualified management team currently at Ambac. We wish him well in his retirement."

Mr. Callen said, "***We have great confidence in our plan to enhance Ambac's capital position by over $1 billion within an accelerated time frame. We are optimistic about the long-term business opportunities ahead for Ambac, even as we respond to the volatility in the present credit market. We expect that our experienced management team, significant size and scale, and expertise in growing market sectors such as global infrastructure finance will help us tap the potential of the market today and into the future.***" Mr. Callen also stated that the Company has been working with Credit Suisse as its financial adviser.

Mark-to-market and Losses

The Company also announced the results of its fourth quarter fair value review of its outstanding credit derivative contracts. Ambac's estimate of the fair value or "mark-to-market" ***adjustment for its credit derivative portfolio for the quarter ended December 31, 2007 amounted to an estimated loss of $5.4 billion***, pre-tax, $3.5 billion, after tax. Of the estimated $5.4 billion pre-tax mark-to-market loss, approximately $1.1 billion represents estimated credit impairment related to certain collateralized debt obligations of asset-backed securities transactions. These transactions are backed primarily by mezzanine level subprime residential mortgage-backed securities that have been internally downgraded to below investment grade. Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims and that, in the absence of further credit impairment, the cumulative marks would be expected to reverse over the remaining life of the insured transactions.

Ambac also expects to report a loss provision amounting to approximately $143 million, pre-tax. The loss provision relates primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations.

As a result of the aforementioned losses, Ambac expects to report a net loss per share of up to $32.83 for the fourth quarter ended December 31, 2007. Earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts internally rated investment grade, as well as certain other items. Ambac expects to report operating losses(1) per share of up to $5.80 for the fourth quarter primarily as a result of the aforementioned losses on CDOs and home equity line of credit transactions. In addition, book value per share is expected to be approximately $21.00 per share at December 31, 2007.

\*     \*     \*

Fourth Quarter Earnings Release and Conference Call

Ambac will move the reporting of its fourth quarter results to Tuesday, January 22, 2008 at 6:00 a.m. (ET), from the originally scheduled date of Wednesday, January 30, 2008. Messrs. Callen and Sean Leonard, Chief Financial Officer, will host a conference call that day at 10:00 a.m. (ET) to discuss the financial results and the status of Ambac's capital expansion plan. The call in number to listen in is 877-407-0778 (U.S.) and 201-689-8565 (outside the U.S.). The conference call will also be webcast live at www.ambac.com.

Ambac is providing this preliminary information about its fourth quarter results prior to the scheduled earnings announcement date in light of market events of recent months and the management change. Investors should not expect Ambac to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates. In addition, investors should not expect Ambac to update the information provided in this release in advance of the scheduled announcement date for its fourth quarter.

77.    This news of large losses and shrinking dividends caused the price of Ambac stock to drop dramatically. The stock price went from $21.14 per share on January 15, 2008 to $12.97 per share on January 16, 2008 – a loss of nearly 39% -- ,on very high volume of 17.9 million shares.

78.    The very next day, January 17, 2008, the Individual Defendants caused Ambac to issue a press release entitled "Ambac Comments on Recent Moody's Report." The report stated in pertinent part:

Ambac Financial Group, Inc. (Ambac), the parent company of Ambac Assurance Corporation, today commented on a January 16, 2008 announcement by Moody's Investors Service that it has placed Ambac Assurance Corporation's 'Aaa' insurance financial strength rating on review for possible downgrade.

In view of the uncertainty generated by Moody's surprising announcement, Ambac is assessing the impact of this action on the Company's previously announced capital plan.

Management remains confident in Ambac's insured portfolio and will communicate further on these matters in its previously scheduled conference call on Tuesday, January 22, 2008 at 10 a.m. (ET).

79.     *This news continued to cause the precipitous fall of Ambac's stock to $6.24 per share, a decrease of 52% in a single day, on an alarmingly high volume of 62.79 million shares. The $6.24 value was the lowest trading price for Ambac's stock in over 25 years.*

80.     On the following day, Friday, January 18, 2008, the Individual Defendants caused the Company to issue a press release entitled "Ambac Chooses Not to Raise Equity Capital under Current Market Conditions."  The press release stated in pertinent part:

> NEW YORK--(BUSINESS WIRE)--Jan. 18, 2008--Ambac Financial Group, Inc. (Ambac), stated today that it has determined that as a result of market conditions and other factors, including the recent actions of certain ratings agencies, raising equity capital is not an attractive option at this time. The Company is continuing to evaluate its alternatives.
>
> Ambac remains confident in its insured portfolio and will communicate further on these matters in its previously scheduled conference call on Tuesday, January 22, 2008 at 10 a.m. (ET).

81.     Shortly thereafter, Fitch downgraded Ambac's rating to AA.

82.     The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     The Company lacked requisite internal controls to ensure that the Company's underwriting standards and its internal rating system for its CDO contracts were adequate, and, as a result, the Company's projections and reported results issued during the Relevant Period were based upon defective assumptions and/or manipulated facts;

(b)     The Company's financial statements were materially misstated due to its failure to properly account for its mark-to-market losses;

(c)     Given the deterioration and the increased volatility in the mortgage market, the Company would be forced to tighten its underwriting standards related to its asset-backed

securities, which would have a direct material negative impact on its premium production going forward;

(d)     The Company had far greater exposure to anticipated losses and defaults related to its CDO contracts containing subprime loans, including even highly rated CDOs, than it had previously disclosed;

(e)     The Company had far greater exposure to a potential ratings downgrade from one of the credit ratings agencies than it had previously disclosed; and

(f)     The Individual Defendants' Relevant Period statements about the Company's selective underwriting practices during the 2005 through 2007 time frame related to its CDOs backed by subprime assets were patently false; the Company's underwriting standards were far too aggressive and completely inadequate.

83.     Finally, as a result of the false statements made by the Individual Defendants, Ambac's stock price traded at inflated levels during the Relevant Period.  This allowed defendants to sell their Ambac stock at inflated prices for proceeds of over $131 million.  After the above revelations slowly were revealed to the public, the Company's stock price was decimated by heavy selling.  Ambac's shares declined by more than 93.5% from the Relevant Period and all- time high of $96.08 per share (May 18, 2007) to the stock's lowest closing price in more than 25 years --  $6.20 per share on January 18, 2008.

84.     On January 22, 2008, Ambac released a press release highlighting its results for the fourth quarter 2007.  In the press release Ambac confirmed the staggering losses disclosed by the January 18, 2008 press release.  The press release stated in pertinent part:

**Ambac Financial Group, Inc. Announces Fourth Quarter Net Loss of $3,255.6 Million**

*Fourth Quarter Net Loss Per Share of $31.85 Reflects Mark-to-Market Losses on Credit Derivatives Portfolio Amounting to $33.14 Per Share Fourth Quarter Credit Enhancement Production(1) $304.5 million, down 3%*

Ambac Financial Group, Inc. (NYSE: ABK) (Ambac) today announced a fourth quarter 2007 net loss of $3,255.6 million, or a net loss of $31.85 on a per share basis. This compares to fourth quarter 2006 net income of $202.7 million, or net income per diluted share of $1.88. ***The decrease is primarily due to non-cash, mark-to-market losses on credit derivative exposures amounting to $5,211.0 million***, pre-tax, or a net loss of $33.14 per share in the fourth quarter 2007 driven by significant changes in fair value of the exposures during the quarter. The decrease was also caused in part by the current quarter's loss provision which increased to $208.5 million in the fourth quarter 2007 from $9.6 million in the comparable prior year quarter.

Strategy, Ratings and Capital Position

Ambac Chairman and Interim Chief Executive Officer, Michael Callen stated, "We view the current perceptions of Ambac's business by both the market and ratings agencies as underestimating Ambac's strengths and future potential. As of December 31, 2007, the Company had claims-paying ability of $14.5 billion, supported by a high quality investment portfolio. Ambac's liquidity position is similarly strong. Corporate debt service requirements and corporate expenses are significantly lower than current dividend capacity from the operating company. Claim payments in 2007 were negative $2 million and we paid no claims related to our CDO of ABS portfolio." Mr. Callen continued, "Capitalizing on our experienced management team and highly qualified professionals worldwide, significant size and scale, and expertise in many market sectors, we believe that Ambac can realize new business opportunities in our core markets and through reinsurance while we strengthen our capital position further to maintain our triple-A ratings under S&P and Moody's and seek to regain it under Fitch."

In addition, Mr. Callen noted that the Company is evaluating strategic alternatives with a number of potential parties. "We are exploring the attractiveness of these alternatives as we look for opportunities that will grow shareholder value and enable us to build on Ambac's fundamental strengths. At the same time, we would expect that over the longer-term, as the market normalizes and perceptions correspond more closely to reality, the market will more accurately assess our assets and strengths."

The Company explained that in the fall of 2007, each of the major rating agencies began a review of the capital adequacy of the financial guaranty industry. In late December, following the rating agency reviews, Ambac's triple-A rating was affirmed by both S&P (with "negative outlook") and Moody's; however, Fitch placed Ambac's 'AAA' rating on "rating watch negative" and stated that Ambac had a modeled $1 billion capital shortfall. On January 16, 2008, the Company announced a

plan to raise equity capital of $1 billion or more in order to meet or exceed Fitch's 'AAA' rating requirements. Following this announcement, Moody's put its 'Aaa' rating on review for possible downgrade. On January 18, 2008, Ambac announced that it had determined that as a result of market conditions and other factors, including the recent actions of certain ratings agencies, raising equity capital was not an attractive option at that time. On January 18, 2008, Fitch downgraded Ambac's insurance financial strength rating to AA. Moody's and S&P are currently reviewing Ambac's triple-A ratings for a possible reduction as well.

Notwithstanding these actions, management remains confident that Ambac's capital position and claims paying ability remain strong. Management is equally confident in Ambac's insured portfolio and the Company's ability to support policyholder liabilities.

Mark-to-Market Loss

*The $5,211.0 million fourth quarter 2007 mark-to-market loss on credit derivative exposures includes estimated credit impairment of $1,105.7 million related to certain collateralized debt obligations of asset-backed securities backed primarily by mezzanine level subprime residential mortgage-backed securities that have recently been internally downgraded to below investment grade*. An estimate for credit impairment has been established because it is management's expectation that Ambac will have to make claim payments on these exposures in the future. As further described below, earnings measures reported by research analysts are on an operating basis and exclude the net income impact of mark-to-market gains and losses on credit derivative contracts internally rated investment grade, as well as certain other items. Operating earnings in the fourth quarter 2007 includes the impact of the estimated $1,105.7 million credit impairment, which on an after-tax per share basis amounts to a loss of $7.03.

Net Income/(Loss) Per Diluted Share

Net loss per share and net income per diluted share are computed in conformity with U.S. generally accepted accounting principles (GAAP). However, many research analysts and investors do not limit their analysis of our earnings to a strictly GAAP basis. In order to assist investors in their understanding of quarterly results, Ambac provides additional information.

Earnings measures reported by research analysts exclude the net income/(loss) impact of net gains and losses from sales of investment securities and mark-to-market gains and losses on credit, total return and non-trading derivative contracts internally rated investment grade (collectively "net security gains and losses") and certain other items. Other items in the fourth quarter 2006 represents the write-off of previously deferred issuance expenses related to debentures that were redeemed in October 2006. Certain research analysts and investors further exclude the net income impact of accelerated premiums earned on guaranteed obligations that have been refunded and other accelerated earnings ("accelerated earnings"). During

the fourth quarter 2007, net security gains and losses had the effect of decreasing net income by $2,620.6 million, or $25.64 on a per share basis. Accelerated earnings had the effect of increasing net income by $18.4 million, or $0.18 per diluted share during the quarter. Table I provides fourth quarter and full year comparisons of earnings for 2007 and 2006.

85.    The Individual Defendants, and each of them, caused the above events to unfold. These events were responsible for the loss of $9.1 billion in market capitalization in just a few months.

## DERIVATIVE ALLEGATIONS

86.    Plaintiff brings this action derivatively pursuant to F.R.C.P. 23.1 on behalf and for the benefit of the Company to remedy the wrongdoing alleged herein.

87.    Plaintiff is currently a shareholder of Ambac and  was an owner of Ambac stock during the time of the transaction complained of herein.

88.    Plaintiff will fairly and adequately represent the interests of the Company and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## INSIDER TRADING

89.    The Insider Selling Defendants, because of their positions, knew that the statements they caused the Company to make were false and misleading when made.  They also knew that the misstatements would create an inflated stock price.  The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than the stock was worth.  While in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Ambac's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BIENSTOCK | 10/31/2005 | 185 | $70.71 | $13,081.35 |
| | 10/31/2005 | 400 | $70.72 | $28,288.00 |
| | 10/31/2005 | 200 | $70.73 | $14,146.00 |
| | 10/31/2005 | 100 | $70.74 | $7,074.00 |
| | 10/31/2005 | 300 | $70.78 | $21,234.00 |
| | 10/31/2005 | 2,900 | $70.79 | $205,291.00 |

| | | | |
|---|---|---|---|
| | 10/31/2005 | 200 | $70.80 | $14,160.00 |
| | 11/15/2005 | 3,015 | $75.75 | $228,386.25 |
| | 11/22/2005 | 1,039 | $76.13 | $79,099.07 |
| | 2/1/2006 | 393 | $76.83 | $30,194.19 |
| | 2/1/2006 | 130 | $76.83 | $9,987.90 |
| | 2/1/2006 | 2 | $76.83 | $153.66 |
| | 3/20/2006 | 2,000 | $81.50 | $163,000.00 |
| | 3/20/2006 | 2,200 | $81.51 | $179,322.00 |
| | 3/20/2006 | 1,500 | $81.52 | $122,280.00 |
| | 3/20/2006 | 793 | $81.54 | $64,661.22 |
| | 3/20/2006 | 400 | $81.55 | $32,620.00 |
| | 8/30/2006 | 100 | $87.19 | $8,719.00 |
| | 8/30/2006 | 5,900 | $87.20 | $514,480.00 |
| | 8/30/2006 | 1,900 | $87.21 | $165,699.00 |
| | 8/30/2006 | 1,000 | $87.22 | $87,220.00 |
| | 8/30/2006 | 900 | $87.23 | $78,507.00 |
| | 8/30/2006 | 200 | $87.24 | $17,448.00 |
| | 12/18/2006 | 500 | $90.03 | $45,015.00 |
| | 12/18/2006 | 800 | $90.05 | $72,040.00 |
| | 12/18/2006 | 500 | $90.06 | $45,030.00 |
| | 12/18/2006 | 500 | $90.07 | $45,035.00 |
| | 12/18/2006 | 1,000 | $90.08 | $90,080.00 |
| | 12/18/2006 | 800 | $90.09 | $72,072.00 |
| | 12/18/2006 | 900 | $90.10 | $81,090.00 |
| | 12/18/2006 | 300 | $90.11 | $27,033.00 |
| | 12/18/2006 | 1,900 | $90.13 | $171,247.00 |
| | 12/18/2006 | 1,500 | $90.15 | $135,225.00 |
| | 12/18/2006 | 400 | $90.17 | $36,068.00 |
| | 12/18/2006 | 1,600 | $90.18 | $144,288.00 |
| | 12/18/2006 | 200 | $90.19 | $18,038.00 |
| | 12/18/2006 | 1,100 | $90.20 | $99,220.00 |
| | 2/2/2007 | 1,406 | $88.53 | $124,473.18 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 284 | $88.53 | $25,142.52 |
| | 2/2/2007 | 95 | $88.53 | $8,410.35 |
| | 5/31/2007 | 107 | $90.28 | $9,659.96 |
| | | **40,117** | | **$3,375,650** |
| | | | | |
| **CALLEN** | 10/21/2005 | 5,000 | $69.12 | $345,600.00 |
| | 5/11/2006 | 3,000 | $83.30 | $249,900.00 |
| | 4/27/2007 | 2,300 | $92.62 | $213,026.00 |
| | 4/27/2007 | 200 | $92.63 | $18,526.00 |
| | 4/27/2007 | 750 | $92.64 | $69,480.00 |
| | 4/27/2007 | 500 | $92.65 | $46,325.00 |
| | | **11,750** | | **$942,857** |
| | | | | |
| **DOYLE** | 11/2/2005 | 12,910 | $74.70 | $964,377.00 |
| | 1/27/2006 | 181 | $76.64 | $13,871.84 |
| | 3/16/2006 | 4,900 | $80.50 | $394,450.00 |
| | 3/16/2006 | 500 | $80.51 | $40,255.00 |
| | 3/16/2006 | 100 | $80.53 | $8,053.00 |

| | | | |
|---|---|---|---|
| | 3/16/2006 | 100 | $80.55 | $8,055.00 |
| | 3/16/2006 | 2,000 | $80.56 | $161,120.00 |
| | 3/16/2006 | 600 | $80.57 | $48,342.00 |
| | 3/16/2006 | 100 | $80.60 | $8,060.00 |
| | 3/16/2006 | 100 | $80.61 | $8,061.00 |
| | 3/16/2006 | 200 | $80.66 | $16,132.00 |
| | 3/16/2006 | 3,900 | $80.67 | $314,613.00 |
| | 3/16/2006 | 500 | $80.68 | $40,340.00 |
| | 3/16/2006 | 1,208 | $80.69 | $97,473.52 |
| | 3/16/2006 | 900 | $80.71 | $72,639.00 |
| | 3/16/2006 | 2,900 | $80.79 | $234,291.00 |
| | 2/2/2007 | 1,101 | $88.53 | $97,471.53 |
| | 2/2/2007 | 481 | $88.53 | $42,582.93 |
| | 2/2/2007 | 181 | $88.53 | $16,023.93 |
| | 2/16/2007 | 300 | $90.43 | $27,129.00 |
| | 2/16/2007 | 400 | $90.44 | $36,176.00 |
| | 2/16/2007 | 900 | $90.45 | $81,405.00 |
| | 2/16/2007 | 100 | $90.46 | $9,046.00 |
| | 2/16/2007 | 200 | $90.49 | $18,098.00 |
| | 2/16/2007 | 700 | $90.50 | $63,350.00 |
| | 2/16/2007 | 400 | $90.51 | $36,204.00 |
| | 2/16/2007 | 800 | $90.52 | $72,416.00 |
| | 2/16/2007 | 600 | $90.53 | $54,318.00 |
| | 2/16/2007 | 200 | $90.55 | $18,110.00 |
| | 2/16/2007 | 200 | $90.59 | $18,118.00 |
| | 2/16/2007 | 100 | $90.60 | $9,060.00 |
| | 2/16/2007 | 300 | $90.63 | $27,189.00 |
| | 2/16/2007 | 100 | $90.64 | $9,064.00 |
| | 2/16/2007 | 100 | $90.71 | $9,071.00 |
| | 2/16/2007 | 400 | $90.72 | $36,288.00 |
| | 2/16/2007 | 200 | $90.81 | $18,162.00 |
| | 2/16/2007 | 100 | $91.01 | $9,101.00 |
| | 2/16/2007 | 1,000 | $91.02 | $91,020.00 |
| | 2/16/2007 | 300 | $91.03 | $27,309.00 |
| | 2/16/2007 | 300 | $91.04 | $27,312.00 |
| | 2/16/2007 | 400 | $91.05 | $36,420.00 |
| | 2/16/2007 | 500 | $91.06 | $45,530.00 |
| | 2/16/2007 | 400 | $91.08 | $36,432.00 |
| | 2/16/2007 | 300 | $91.09 | $27,327.00 |
| | 2/16/2007 | 200 | $91.10 | $18,220.00 |
| | 2/16/2007 | 300 | $91.11 | $27,333.00 |
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 100 | $91.13 | $9,113.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 200 | $91.19 | $18,238.00 |
| | 2/16/2007 | 700 | $91.20 | $63,840.00 |
| | 2/16/2007 | 400 | $91.21 | $36,484.00 |
| | 2/16/2007 | 700 | $91.22 | $63,854.00 |
| | 2/16/2007 | 300 | $91.23 | $27,369.00 |

| | | | |
|---|---|---|---|
| | 2/16/2007 | 300 | $91.24 | $27,372.00 |
| | 2/16/2007 | 1,400 | $91.25 | $127,750.00 |
| | 2/16/2007 | 300 | $91.26 | $27,378.00 |
| | 2/16/2007 | 300 | $91.27 | $27,381.00 |
| | 2/16/2007 | 300 | $91.29 | $27,387.00 |
| | 2/16/2007 | 200 | $91.30 | $18,260.00 |
| | 2/16/2007 | 200 | $91.31 | $18,262.00 |
| | 2/16/2007 | 200 | $91.32 | $18,264.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 300 | $91.36 | $27,408.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 200 | $91.41 | $18,282.00 |
| | 2/16/2007 | 200 | $91.42 | $18,284.00 |
| | 2/16/2007 | 100 | $91.43 | $9,143.00 |
| | 2/16/2007 | 100 | $91.45 | $9,145.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.50 | $9,150.00 |
| | 2/16/2007 | 100 | $91.52 | $9,152.00 |
| | 2/16/2007 | 100 | $91.53 | $9,153.00 |
| | 2/16/2007 | 200 | $94.14 | $18,828.00 |
| | | **50,862** | | **$4,224,441.75** |
| | | | | |
| **GANDOLFO** | 1/27/2006 | 294 | $76.64 | $22,532.16 |
| | 5/3/2006 | 225 | $82.75 | $18,618.75 |
| | 5/3/2006 | 1,700 | $82.76 | $140,692.00 |
| | 5/3/2006 | 1,200 | $82.77 | $99,324.00 |
| | 5/3/2006 | 400 | $82.78 | $33,112.00 |
| | 5/3/2006 | 800 | $82.79 | $66,232.00 |
| | 5/3/2006 | 1,100 | $82.80 | $91,080.00 |
| | 5/3/2006 | 200 | $82.81 | $16,562.00 |
| | 2/2/2007 | 1,977 | $88.53 | $175,023.81 |
| | 2/2/2007 | 1,215 | $88.53 | $107,563.95 |
| | 2/2/2007 | 176 | $88.53 | $15,581.28 |
| | 2/9/2007 | 2,000 | $89.05 | $178,100.00 |
| | 2/9/2007 | 900 | $89.06 | $80,154.00 |
| | 2/9/2007 | 1,400 | $89.07 | $124,698.00 |
| | 2/9/2007 | 400 | $89.08 | $35,632.00 |
| | 2/9/2007 | 900 | $89.09 | $80,181.00 |
| | 2/9/2007 | 500 | $89.10 | $44,550.00 |
| | 2/9/2007 | 800 | $89.11 | $71,288.00 |
| | 2/9/2007 | 700 | $89.12 | $62,384.00 |
| | 2/9/2007 | 928 | $89.13 | $82,712.64 |
| | 2/9/2007 | 1,472 | $89.14 | $131,214.08 |
| | 2/9/2007 | 1,100 | $89.15 | $98,065.00 |
| | 2/9/2007 | 1,300 | $89.16 | $115,908.00 |
| | 2/9/2007 | 1,800 | $89.17 | $160,506.00 |
| | 2/9/2007 | 700 | $89.18 | $62,426.00 |
| | 2/9/2007 | 100 | $89.19 | $8,919.00 |
| | 2/9/2007 | 300 | $89.20 | $26,760.00 |

| | | | |
|---|---|---|---|
| | 2/9/2007 | 200 | $89.21 | $17,842.00 |
| | 2/9/2007 | 100 | $89.22 | $8,922.00 |
| | 2/9/2007 | 100 | $89.23 | $8,923.00 |
| | 2/9/2007 | 300 | $89.24 | $26,772.00 |
| | | **25,287** | | **$2,212,278.67** |
| | | | | |
| **GENADER** | 11/2/2005 | 64,100 | $74.25 | $4,759,425.00 |
| | 11/2/2005 | 1,600 | $74.26 | $118,816.00 |
| | 11/2/2005 | 6,300 | $74.27 | $467,901.00 |
| | 11/2/2005 | 9,300 | $74.50 | $692,850.00 |
| | 11/2/2005 | 2,700 | $74.75 | $201,825.00 |
| | 11/2/2005 | 500 | $74.76 | $37,380.00 |
| | 11/2/2005 | 5,500 | $74.77 | $411,235.00 |
| | 12/12/2005 | 26,952 | $76.87 | $2,071,800.24 |
| | 12/14/2005 | 100 | $77.79 | $7,779.00 |
| | 12/14/2005 | 800 | $77.81 | $62,248.00 |
| | 12/14/2005 | 100 | $77.82 | $7,782.00 |
| | 12/14/2005 | 100 | $77.84 | $7,784.00 |
| | 12/14/2005 | 600 | $77.86 | $46,716.00 |
| | 12/14/2005 | 500 | $77.87 | $38,935.00 |
| | 12/14/2005 | 3,200 | $77.88 | $249,216.00 |
| | 12/14/2005 | 200 | $77.88 | $15,576.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 100 | $77.88 | $7,788.00 |
| | 12/14/2005 | 200 | $77.89 | $15,578.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 100 | $77.89 | $7,789.00 |
| | 12/14/2005 | 400 | $77.90 | $31,160.00 |
| | 12/14/2005 | 200 | $77.90 | $15,580.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 100 | $77.90 | $7,790.00 |
| | 12/14/2005 | 600 | $77.91 | $46,746.00 |
| | 12/14/2005 | 200 | $77.91 | $15,582.00 |
| | 12/14/2005 | 200 | $77.91 | $15,582.00 |
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |
| | 12/14/2005 | 100 | $77.91 | $7,791.00 |
| | 12/14/2005 | 2,200 | $77.92 | $171,424.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 200 | $77.92 | $15,584.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 100 | $77.92 | $7,792.00 |
| | 12/14/2005 | 300 | $77.93 | $23,379.00 |
| | 12/14/2005 | 700 | $77.94 | $54,558.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 500 | $77.94 | $38,970.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |
| | 12/14/2005 | 300 | $77.94 | $23,382.00 |

| | | | |
|---|---|---|---|
| | 12/14/2005 | 100 | $77.94 | $7,794.00 |
| | 12/14/2005 | 2,100 | $77.95 | $163,695.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 400 | $77.95 | $31,180.00 |
| | 12/14/2005 | 100 | $77.95 | $7,795.00 |
| | 12/14/2005 | 200 | $77.96 | $15,592.00 |
| | 12/14/2005 | 400 | $77.97 | $31,188.00 |
| | 12/14/2005 | 100 | $77.97 | $7,797.00 |
| | 12/14/2005 | 2,000 | $77.98 | $155,960.00 |
| | 12/14/2005 | 300 | $77.98 | $23,394.00 |
| | 12/14/2005 | 200 | $77.98 | $15,596.00 |
| | 12/14/2005 | 100 | $77.98 | $7,798.00 |
| | 12/14/2005 | 900 | $77.99 | $70,191.00 |
| | 12/14/2005 | 100 | $77.99 | $7,799.00 |
| | 12/14/2005 | 1,700 | $78.00 | $132,600.00 |
| | 12/14/2005 | 200 | $78.00 | $15,600.00 |
| | 12/14/2005 | 100 | $78.00 | $7,800.00 |
| | 12/14/2005 | 200 | $78.01 | $15,602.00 |
| | 12/14/2005 | 100 | $78.01 | $7,801.00 |
| | 12/14/2005 | 1,500 | $78.02 | $117,030.00 |
| | 12/14/2005 | 500 | $78.02 | $39,010.00 |
| | 12/14/2005 | 300 | $78.02 | $23,406.00 |
| | 12/14/2005 | 100 | $78.02 | $7,802.00 |
| | 12/14/2005 | 200 | $78.03 | $15,606.00 |
| | 12/14/2005 | 100 | $78.04 | $7,804.00 |
| | 12/14/2005 | 500 | $78.05 | $39,025.00 |
| | 12/14/2005 | 400 | $78.05 | $31,220.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 100 | $78.05 | $7,805.00 |
| | 12/14/2005 | 900 | $78.06 | $70,254.00 |
| | 12/14/2005 | 100 | $78.06 | $7,806.00 |
| | 12/14/2005 | 300 | $78.07 | $23,421.00 |
| | 12/14/2005 | 100 | $78.07 | $7,807.00 |
| | 12/14/2005 | 400 | $78.08 | $31,232.00 |
| | 12/14/2005 | 300 | $78.09 | $23,427.00 |
| | 12/14/2005 | 100 | $78.10 | $7,810.00 |
| | 12/14/2005 | 200 | $78.11 | $15,622.00 |
| | 12/14/2005 | 200 | $78.12 | $15,624.00 |
| | 12/14/2005 | 900 | $78.13 | $70,317.00 |
| | 12/14/2005 | 800 | $78.13 | $62,504.00 |
| | 12/14/2005 | 100 | $78.15 | $7,815.00 |
| | 12/14/2005 | 2,538 | $78.18 | $198,420.84 |
| | 12/14/2005 | 100 | $78.19 | $7,819.00 |
| | 12/14/2005 | 800 | $78.20 | $62,560.00 |
| | 12/14/2005 | 700 | $78.21 | $54,747.00 |
| | 12/14/2005 | 300 | $78.23 | $23,469.00 |
| | 1/27/2006 | 578 | $76.64 | $44,297.92 |
| | 1/27/2006 | 540 | $76.64 | $41,385.60 |
| | 1/27/2006 | 531 | $76.64 | $40,695.84 |
| | 3/14/2006 | 1,800 | $79.23 | $142,614.00 |
| | 3/14/2006 | 200 | $79.24 | $15,848.00 |

| | 3/14/2006 | 120 | $79.36 | $9,523.20 |
|---|---|---|---|---|
| | 5/9/2006 | 8,161 | $82.76 | $675,404.36 |
| | 5/9/2006 | 2,477 | $82.76 | $204,996.52 |
| | 5/10/2006 | 1,500 | $83.00 | $124,500.00 |
| | 5/10/2006 | 100 | $83.01 | $8,301.00 |
| | 5/10/2006 | 3,200 | $83.02 | $265,664.00 |
| | 5/10/2006 | 500 | $83.03 | $41,515.00 |
| | 5/10/2006 | 4,000 | $83.04 | $332,160.00 |
| | 5/10/2006 | 800 | $83.05 | $66,440.00 |
| | 5/10/2006 | 2,084 | $83.06 | $173,097.04 |
| | 5/10/2006 | 1,500 | $83.07 | $124,605.00 |
| | 5/10/2006 | 300 | $83.08 | $24,924.00 |
| | 5/10/2006 | 500 | $83.10 | $41,550.00 |
| | 8/23/2006 | 24,600 | $85.40 | $2,100,840.00 |
| | 8/23/2006 | 3,600 | $85.41 | $307,476.00 |
| | 8/23/2006 | 4,000 | $85.42 | $341,680.00 |
| | 8/23/2006 | 2,200 | $85.43 | $187,946.00 |
| | 8/23/2006 | 2,500 | $85.44 | $213,600.00 |
| | 8/23/2006 | 1,700 | $85.45 | $145,265.00 |
| | 8/23/2006 | 2,700 | $85.46 | $230,742.00 |
| | 8/23/2006 | 2,500 | $85.47 | $213,675.00 |
| | 8/23/2006 | 3,100 | $85.48 | $264,988.00 |
| | 8/23/2006 | 2,300 | $85.49 | $196,627.00 |
| | 8/23/2006 | 6,600 | $85.50 | $564,300.00 |
| | 8/23/2006 | 1,800 | $85.51 | $153,918.00 |
| | 8/23/2006 | 500 | $85.53 | $42,765.00 |
| | 8/23/2006 | 358 | $85.55 | $30,626.90 |
| | 2/2/2007 | 1,673 | $88.53 | $148,110.69 |
| | 2/2/2007 | 633 | $88.53 | $56,039.49 |
| | 2/2/2007 | 626 | $88.53 | $55,419.78 |
| | 2/2/2007 | 593 | $88.53 | $52,498.29 |
| | 2/2/2007 | 582 | $88.53 | $51,524.46 |
| | 2/2/2007 | 535 | $88.53 | $47,363.55 |
| | 2/15/2007 | 1,787 | $91.00 | $162,617.00 |
| | 2/15/2007 | 100 | $91.01 | $9,101.00 |
| | 2/15/2007 | 200 | $91.02 | $18,204.00 |
| | 2/15/2007 | 345 | $91.03 | $31,405.35 |
| | 2/15/2007 | 300 | $91.04 | $27,312.00 |
| | 2/15/2007 | 100 | $91.05 | $9,105.00 |
| | 2/15/2007 | 200 | $91.07 | $18,214.00 |
| | 2/15/2007 | 92 | $91.09 | $8,380.28 |
| | 2/15/2007 | 8 | $91.12 | $728.96 |
| | 2/15/2007 | 200 | $91.13 | $18,226.00 |
| | 2/15/2007 | 400 | $91.16 | $36,464.00 |
| | 2/15/2007 | 100 | $91.17 | $9,117.00 |
| | 2/15/2007 | 200 | $91.20 | $18,240.00 |
| | 2/15/2007 | 100 | $91.23 | $9,123.00 |
| | 2/15/2007 | 100 | $91.24 | $9,124.00 |
| | 2/15/2007 | 400 | $91.25 | $36,500.00 |
| | 2/15/2007 | 200 | $91.28 | $18,256.00 |
| | 2/15/2007 | 100 | $91.30 | $9,130.00 |

|  | | | | |
|---|---|---|---|---|
|  | 2/15/2007 | 200 | $91.31 | $18,262.00 |
|  | 2/15/2007 | 200 | $91.34 | $18,268.00 |
|  | 4/27/2007 | 10,800 | $92.60 | $1,000,080.00 |
|  | 4/27/2007 | 1,500 | $92.61 | $138,915.00 |
|  | 4/27/2007 | 4,100 | $92.62 | $379,742.00 |
|  | 4/27/2007 | 4,000 | $92.63 | $370,520.00 |
|  | 4/27/2007 | 400 | $92.64 | $37,056.00 |
|  | 4/27/2007 | 11,600 | $92.65 | $1,074,740.00 |
|  | 4/27/2007 | 100 | $92.66 | $9,266.00 |
|  | 4/27/2007 | 200 | $92.67 | $18,534.00 |
|  | 4/27/2007 | 5,400 | $92.68 | $500,472.00 |
|  | 4/27/2007 | 300 | $92.69 | $27,807.00 |
|  | 4/27/2007 | 19,500 | $92.70 | $1,807,650.00 |
|  | 4/27/2007 | 3,500 | $92.71 | $324,485.00 |
|  | 4/27/2007 | 4,400 | $92.72 | $407,968.00 |
|  | 4/27/2007 | 7,200 | $92.74 | $667,728.00 |
|  | 4/27/2007 | 12,500 | $92.75 | $1,159,375.00 |
|  | 4/27/2007 | 200 | $92.76 | $18,552.00 |
|  | 4/27/2007 | 100 | $92.77 | $9,277.00 |
|  | 4/27/2007 | 2,000 | $92.78 | $185,560.00 |
|  | 4/27/2007 | 15,300 | $92.80 | $1,419,840.00 |
|  | 4/27/2007 | 6,700 | $92.82 | $621,894.00 |
|  | 4/27/2007 | 200 | $92.85 | $18,570.00 |
|  |  | **360,013** |  | **$30,015,291.31** |
|  |  |  |  |  |
| **LASSITER** | 11/7/2005 | 1,100 | $74.25 | $81,675.00 |
|  | 11/7/2005 | 1,100 | $74.26 | $81,686.00 |
|  | 11/7/2005 | 700 | $74.28 | $51,996.00 |
|  | 11/7/2005 | 1,200 | $74.29 | $89,148.00 |
|  | 11/7/2005 | 5,200 | $74.30 | $386,360.00 |
|  | 11/7/2005 | 900 | $74.31 | $66,879.00 |
|  | 11/7/2005 | 1,500 | $74.32 | $111,480.00 |
|  | 11/7/2005 | 600 | $74.33 | $44,598.00 |
|  | 11/7/2005 | 2,700 | $74.34 | $200,718.00 |
|  | 11/7/2005 | 200 | $74.35 | $14,870.00 |
|  | 11/7/2005 | 1,700 | $74.36 | $126,412.00 |
|  | 11/7/2005 | 1,500 | $74.37 | $111,555.00 |
|  | 11/7/2005 | 3,200 | $74.38 | $238,016.00 |
|  | 11/7/2005 | 1,800 | $74.39 | $133,902.00 |
|  | 11/7/2005 | 2,400 | $74.40 | $178,560.00 |
|  | 11/7/2005 | 2,800 | $74.41 | $208,348.00 |
|  | 11/7/2005 | 1,900 | $74.42 | $141,398.00 |
|  | 11/7/2005 | 300 | $74.43 | $22,329.00 |
|  | 11/7/2005 | 1,322 | $74.44 | $98,409.68 |
|  | 11/7/2005 | 500 | $74.45 | $37,225.00 |
|  | 11/7/2005 | 3,678 | $74.46 | $273,863.88 |
|  | 11/7/2005 | 3,300 | $74.47 | $245,751.00 |
|  | 11/7/2005 | 2,800 | $74.48 | $208,544.00 |
|  | 11/7/2005 | 700 | $74.49 | $52,143.00 |
|  | 11/7/2005 | 6,929 | $74.50 | $516,210.50 |
|  | 11/7/2005 | 2,100 | $74.51 | $156,471.00 |

| | | | |
|---|---|---|---|
| 11/7/2005 | 3,772 | $74.52 | $281,089.44 |
| 11/7/2005 | 1,600 | $74.53 | $119,248.00 |
| 11/7/2005 | 700 | $74.54 | $52,178.00 |
| 11/7/2005 | 1,500 | $74.55 | $111,825.00 |
| 11/7/2005 | 2,900 | $74.56 | $216,224.00 |
| 11/7/2005 | 500 | $74.57 | $37,285.00 |
| 11/7/2005 | 1,000 | $74.58 | $74,580.00 |
| 11/7/2005 | 200 | $74.59 | $14,918.00 |
| 11/7/2005 | 400 | $74.60 | $29,840.00 |
| 11/7/2005 | 200 | $74.61 | $14,922.00 |
| 11/7/2005 | 100 | $74.62 | $7,462.00 |
| 11/7/2005 | 600 | $74.63 | $44,778.00 |
| 11/7/2005 | 600 | $74.66 | $44,796.00 |
| 11/7/2005 | 1,900 | $74.67 | $141,873.00 |
| 11/7/2005 | 200 | $74.68 | $14,936.00 |
| 11/7/2005 | 200 | $74.69 | $14,938.00 |
| 11/7/2005 | 4,700 | $74.70 | $351,090.00 |
| 11/7/2005 | 700 | $74.71 | $52,297.00 |
| 11/7/2005 | 1,100 | $74.72 | $82,192.00 |
| 11/7/2005 | 1,800 | $74.73 | $134,514.00 |
| 11/7/2005 | 7,800 | $74.74 | $582,972.00 |
| 11/7/2005 | 7,700 | $74.75 | $575,575.00 |
| 11/7/2005 | 2,700 | $74.77 | $201,879.00 |
| 12/19/2005 | 7,000 | $77.90 | $545,300.00 |
| 12/19/2005 | 4,600 | $77.91 | $358,386.00 |
| 12/19/2005 | 200 | $77.92 | $15,584.00 |
| 12/19/2005 | 17,395 | $78.00 | $1,356,810.00 |
| 12/19/2005 | 400 | $78.01 | $31,204.00 |
| 12/19/2005 | 1,700 | $78.02 | $132,634.00 |
| 12/19/2005 | 300 | $78.03 | $23,409.00 |
| 12/19/2005 | 400 | $78.04 | $31,216.00 |
| 12/19/2005 | 200 | $78.05 | $15,610.00 |
| 12/19/2005 | 300 | $78.06 | $23,418.00 |
| 1/30/2006 | 142,984 | $76.63 | $10,956,863.92 |
| 7/31/2006 | 177,650 | $82.93 | $14,732,514.50 |
| 7/31/2006 | 66,005 | $82.93 | $5,473,794.65 |
| 7/31/2006 | 31,689 | $82.93 | $2,627,968.77 |
| 7/31/2006 | 5,131 | $82.93 | $425,513.83 |
| 9/12/2006 | 4,600 | $84.90 | $390,540.00 |
| 9/12/2006 | 3,100 | $84.91 | $263,221.00 |
| 9/12/2006 | 500 | $84.92 | $42,460.00 |
| 9/12/2006 | 900 | $84.93 | $76,437.00 |
| 9/12/2006 | 100 | $84.95 | $8,495.00 |
| 9/12/2006 | 3,000 | $84.97 | $254,910.00 |
| 9/12/2006 | 3,400 | $85.00 | $289,000.00 |
| 9/12/2006 | 4,000 | $85.01 | $340,040.00 |
| 9/12/2006 | 200 | $85.03 | $17,006.00 |
| 9/12/2006 | 500 | $85.04 | $42,520.00 |
| 9/12/2006 | 6,400 | $85.05 | $544,320.00 |
| 9/12/2006 | 800 | $85.06 | $68,048.00 |
| 9/12/2006 | 200 | $85.08 | $17,016.00 |

| | 9/12/2006 | 425 | $85.09 | $36,163.25 |
|---|---|---|---|---|
| | 9/12/2006 | 4,400 | $85.10 | $374,440.00 |
| | 9/12/2006 | 4,175 | $85.11 | $355,334.25 |
| | 9/12/2006 | 1,800 | $85.12 | $153,216.00 |
| | 9/12/2006 | 2,200 | $85.13 | $187,286.00 |
| | 9/12/2006 | 1,600 | $85.14 | $136,224.00 |
| | 9/12/2006 | 200 | $85.15 | $17,030.00 |
| | 9/12/2006 | 3,300 | $85.18 | $281,094.00 |
| | 9/12/2006 | 3,300 | $85.20 | $281,160.00 |
| | 9/12/2006 | 300 | $85.21 | $25,563.00 |
| | 9/13/2006 | 600 | $84.38 | $50,628.00 |
| | 9/13/2006 | 200 | $84.39 | $16,878.00 |
| | 9/13/2006 | 800 | $84.40 | $67,520.00 |
| | 9/13/2006 | 700 | $84.41 | $59,087.00 |
| | 9/13/2006 | 600 | $84.42 | $50,652.00 |
| | 9/13/2006 | 300 | $84.43 | $25,329.00 |
| | 9/13/2006 | 1,100 | $84.44 | $92,884.00 |
| | 9/13/2006 | 200 | $84.45 | $16,890.00 |
| | 9/13/2006 | 400 | $84.46 | $33,784.00 |
| | 9/13/2006 | 3,100 | $84.47 | $261,857.00 |
| | 9/13/2006 | 600 | $84.48 | $50,688.00 |
| | 9/13/2006 | 4,000 | $84.49 | $337,960.00 |
| | 9/13/2006 | 4,100 | $84.50 | $346,450.00 |
| | 9/13/2006 | 4,200 | $84.51 | $354,942.00 |
| | 9/13/2006 | 4,700 | $84.52 | $397,244.00 |
| | 9/13/2006 | 2,600 | $84.53 | $219,778.00 |
| | 9/13/2006 | 1,700 | $84.54 | $143,718.00 |
| | 9/13/2006 | 2,200 | $84.55 | $186,010.00 |
| | 9/13/2006 | 1,400 | $84.56 | $118,384.00 |
| | 9/13/2006 | 300 | $84.57 | $25,371.00 |
| | 9/13/2006 | 1,300 | $84.58 | $109,954.00 |
| | 9/13/2006 | 1,800 | $84.59 | $152,262.00 |
| | 9/13/2006 | 700 | $84.60 | $59,220.00 |
| | 9/13/2006 | 1,200 | $84.61 | $101,532.00 |
| | 9/13/2006 | 1,300 | $84.62 | $110,006.00 |
| | 9/13/2006 | 1,000 | $84.63 | $84,630.00 |
| | 9/13/2006 | 2,100 | $84.64 | $177,744.00 |
| | 9/13/2006 | 800 | $84.65 | $67,720.00 |
| | 9/13/2006 | 1,100 | $84.66 | $93,126.00 |
| | 9/13/2006 | 200 | $84.68 | $16,936.00 |
| | 9/13/2006 | 1,100 | $84.69 | $93,159.00 |
| | 9/13/2006 | 1,800 | $84.70 | $152,460.00 |
| | 9/13/2006 | 500 | $84.71 | $42,355.00 |
| | 9/13/2006 | 800 | $84.72 | $67,776.00 |
| | 9/13/2006 | 300 | $84.73 | $25,419.00 |
| | 9/13/2006 | 800 | $84.74 | $67,792.00 |
| | 9/13/2006 | 900 | $84.80 | $76,320.00 |
| | 9/13/2006 | 300 | $84.81 | $25,443.00 |
| | 9/13/2006 | 300 | $84.82 | $25,446.00 |
| | 9/13/2006 | 900 | $84.83 | $76,347.00 |
| | 9/13/2006 | 300 | $84.88 | $25,464.00 |

| | | | |
|---|---|---|---|
| | 9/13/2006 | 600 | $84.90 | $50,940.00 |
| | 9/13/2006 | 300 | $84.92 | $25,476.00 |
| | 9/13/2006 | 300 | $85.01 | $25,503.00 |
| | 9/13/2006 | 300 | $85.02 | $25,506.00 |
| | 9/13/2006 | 300 | $85.06 | $25,518.00 |
| | 9/13/2006 | 300 | $85.07 | $25,521.00 |
| | 9/13/2006 | 300 | $85.10 | $25,530.00 |
| | 9/13/2006 | 300 | $85.11 | $25,533.00 |
| | 9/13/2006 | 300 | $85.12 | $25,536.00 |
| | 9/13/2006 | 900 | $85.13 | $76,617.00 |
| | 9/13/2006 | 300 | $85.14 | $25,542.00 |
| | 9/13/2006 | 200 | $85.15 | $17,030.00 |
| | 9/13/2006 | 100 | $85.15 | $8,515.00 |
| | 9/13/2006 | 300 | $85.18 | $25,554.00 |
| | 9/13/2006 | 300 | $85.20 | $25,560.00 |
| | 9/13/2006 | 300 | $85.21 | $25,563.00 |
| | 9/13/2006 | 1,500 | $85.22 | $127,830.00 |
| | 9/13/2006 | 300 | $85.23 | $25,569.00 |
| | 9/13/2006 | 1,500 | $85.24 | $127,860.00 |
| | 9/13/2006 | 600 | $85.25 | $51,150.00 |
| | 9/13/2006 | 300 | $85.26 | $25,578.00 |
| | 9/13/2006 | 300 | $85.26 | $25,578.00 |
| | 9/13/2006 | 300 | $85.28 | $25,584.00 |
| | 9/13/2006 | 900 | $85.30 | $76,770.00 |
| | 9/13/2006 | 1,500 | $85.31 | $127,965.00 |
| | 9/13/2006 | 900 | $85.33 | $76,797.00 |
| | 9/13/2006 | 600 | $85.34 | $51,204.00 |
| | 9/13/2006 | 1,800 | $85.35 | $153,630.00 |
| | 9/13/2006 | 300 | $85.36 | $25,608.00 |
| | 9/13/2006 | 1,800 | $85.37 | $153,666.00 |
| | 9/13/2006 | 1,500 | $85.38 | $128,070.00 |
| | 9/13/2006 | 600 | $85.39 | $51,234.00 |
| | 9/13/2006 | 1,100 | $85.40 | $93,940.00 |
| | 9/13/2006 | 800 | $85.41 | $68,328.00 |
| | 9/13/2006 | 900 | $85.42 | $76,878.00 |
| | 9/13/2006 | 1,000 | $85.43 | $85,430.00 |
| | 9/13/2006 | 1,400 | $85.44 | $119,616.00 |
| | 9/13/2006 | 300 | $85.45 | $25,635.00 |
| | 9/13/2006 | 1,100 | $85.46 | $94,006.00 |
| | 9/13/2006 | 300 | $85.48 | $25,644.00 |
| | 9/13/2006 | 300 | $85.50 | $25,650.00 |
| | 11/14/2006 | 500 | $83.46 | $41,730.00 |
| | 11/14/2006 | 10,700 | $83.47 | $893,129.00 |
| | 11/14/2006 | 800 | $83.48 | $66,784.00 |
| | 11/14/2006 | 16,100 | $83.49 | $1,344,189.00 |
| | 11/14/2006 | 25,700 | $83.50 | $2,145,950.00 |
| | 11/14/2006 | 1,800 | $83.51 | $150,318.00 |
| | 11/14/2006 | 200 | $83.52 | $16,704.00 |
| | 11/14/2006 | 17,400 | $83.53 | $1,453,422.00 |
| | 11/14/2006 | 2,000 | $83.54 | $167,080.00 |
| | 11/14/2006 | 36,700 | $83.55 | $3,066,285.00 |

| | | | |
|---|---|---|---|
| 11/14/2006 | 200 | $83.56 | $16,712.00 |
| 11/14/2006 | 7,500 | $83.57 | $626,775.00 |
| 11/14/2006 | 5,300 | $83.58 | $442,974.00 |
| 11/14/2006 | 100 | $83.59 | $8,359.00 |
| 2/2/2007 | 21,320 | $88.53 | $1,887,459.60 |
| 2/21/2007 | 5,600 | $90.40 | $506,240.00 |
| 2/21/2007 | 2,500 | $90.40 | $226,000.00 |
| 2/21/2007 | 2,000 | $90.40 | $180,800.00 |
| 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| 2/21/2007 | 1,600 | $90.40 | $144,640.00 |
| 2/21/2007 | 800 | $90.40 | $72,320.00 |
| 2/21/2007 | 700 | $90.40 | $63,280.00 |
| 2/21/2007 | 700 | $90.40 | $63,280.00 |
| 2/21/2007 | 600 | $90.40 | $54,240.00 |
| 2/21/2007 | 450 | $90.40 | $40,680.00 |
| 2/21/2007 | 300 | $90.40 | $27,120.00 |
| 2/21/2007 | 100 | $90.40 | $9,040.00 |
| 2/21/2007 | 600 | $90.41 | $54,246.00 |
| 2/21/2007 | 300 | $90.41 | $27,123.00 |
| 2/21/2007 | 200 | $90.41 | $18,082.00 |
| 2/21/2007 | 200 | $90.41 | $18,082.00 |
| 2/21/2007 | 100 | $90.41 | $9,041.00 |
| 2/21/2007 | 1,100 | $90.42 | $99,462.00 |
| 2/21/2007 | 100 | $90.42 | $9,042.00 |
| 2/21/2007 | 100 | $90.42 | $9,042.00 |
| 2/21/2007 | 100 | $90.42 | $9,042.00 |
| 2/21/2007 | 600 | $90.43 | $54,258.00 |
| 2/21/2007 | 200 | $90.43 | $18,086.00 |
| 2/21/2007 | 200 | $90.43 | $18,086.00 |
| 2/21/2007 | 300 | $90.44 | $27,132.00 |
| 2/21/2007 | 200 | $90.44 | $18,088.00 |
| 2/21/2007 | 200 | $90.44 | $18,088.00 |
| 2/21/2007 | 700 | $90.45 | $63,315.00 |
| 2/21/2007 | 400 | $90.45 | $36,180.00 |
| 2/21/2007 | 400 | $90.45 | $36,180.00 |
| 2/21/2007 | 400 | $90.45 | $36,180.00 |
| 2/21/2007 | 200 | $90.45 | $18,090.00 |
| 2/21/2007 | 100 | $90.45 | $9,045.00 |
| 2/21/2007 | 700 | $90.46 | $63,322.00 |
| 2/21/2007 | 200 | $90.46 | $18,092.00 |
| 2/21/2007 | 100 | $90.46 | $9,046.00 |
| 2/21/2007 | 100 | $90.46 | $9,046.00 |
| 2/21/2007 | 100 | $90.47 | $9,047.00 |
| 2/21/2007 | 100 | $90.49 | $9,049.00 |
| 2/21/2007 | 1,650 | $90.75 | $149,737.50 |
| 2/21/2007 | 1,400 | $90.75 | $127,050.00 |
| 2/21/2007 | 600 | $90.75 | $54,450.00 |
| 2/21/2007 | 500 | $90.75 | $45,375.00 |
| 2/21/2007 | 400 | $90.75 | $36,300.00 |
| 2/21/2007 | 345 | $90.75 | $31,308.75 |
| 2/21/2007 | 300 | $90.75 | $27,225.00 |

| | 2/21/2007 | 200 | $90.75 | $18,150.00 |
|---|---|---|---|---|
| | 2/21/2007 | 100 | $90.75 | $9,075.00 |
| | 2/21/2007 | 600 | $90.76 | $54,456.00 |
| | 2/21/2007 | 600 | $90.76 | $54,456.00 |
| | 2/21/2007 | 300 | $90.77 | $27,231.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 100 | $90.77 | $9,077.00 |
| | 2/21/2007 | 700 | $90.78 | $63,546.00 |
| | 2/21/2007 | 600 | $90.78 | $54,468.00 |
| | 2/21/2007 | 400 | $90.78 | $36,312.00 |
| | 2/21/2007 | 300 | $90.78 | $27,234.00 |
| | 2/21/2007 | 200 | $90.78 | $18,156.00 |
| | 2/21/2007 | 100 | $90.78 | $9,078.00 |
| | 2/21/2007 | 200 | $90.79 | $18,158.00 |
| | 2/21/2007 | 100 | $90.79 | $9,079.00 |
| | 2/21/2007 | 500 | $90.81 | $45,405.00 |
| | 2/21/2007 | 755 | $90.82 | $68,569.10 |
| | 2/21/2007 | 100 | $90.84 | $9,084.00 |
| | 2/21/2007 | 100 | $90.86 | $9,086.00 |
| | 2/21/2007 | 300 | $90.87 | $27,261.00 |
| | 2/21/2007 | 100 | $90.89 | $9,089.00 |
| | 2/21/2007 | 400 | $90.90 | $36,360.00 |
| | 2/21/2007 | 300 | $90.90 | $27,270.00 |
| | 2/21/2007 | 100 | $90.91 | $9,091.00 |
| | 2/21/2007 | 100 | $90.91 | $9,091.00 |
| | 2/21/2007 | 600 | $90.92 | $54,552.00 |
| | 2/21/2007 | 200 | $90.92 | $18,184.00 |
| | 2/21/2007 | 500 | $90.93 | $45,465.00 |
| | 2/21/2007 | 200 | $90.93 | $18,186.00 |
| | 2/21/2007 | 200 | $90.94 | $18,188.00 |
| | 2/21/2007 | 400 | $90.95 | $36,380.00 |
| | 2/21/2007 | 200 | $90.95 | $18,190.00 |
| | 2/21/2007 | 400 | $90.97 | $36,388.00 |
| | 2/21/2007 | 200 | $90.98 | $18,196.00 |
| | 2/21/2007 | 200 | $90.98 | $18,196.00 |
| | 2/21/2007 | 100 | $90.98 | $9,098.00 |
| | 2/21/2007 | 100 | $90.98 | $9,098.00 |
| | 2/21/2007 | 3,000 | $91.00 | $273,000.00 |
| | 2/21/2007 | 800 | $91.00 | $72,800.00 |
| | 2/21/2007 | 100 | $91.00 | $9,100.00 |
| | 2/21/2007 | 100 | $91.03 | $9,103.00 |
| | 2/21/2007 | 400 | $91.06 | $36,424.00 |
| | 2/21/2007 | 200 | $91.07 | $18,214.00 |
| | 2/21/2007 | 200 | $91.08 | $18,216.00 |
| | 2/21/2007 | 100 | $91.08 | $9,108.00 |
| | 2/21/2007 | 600 | $91.10 | $54,660.00 |
| | 2/21/2007 | 300 | $91.10 | $27,330.00 |
| | 2/21/2007 | 100 | $91.13 | $9,113.00 |
| | 2/21/2007 | 100 | $91.15 | $9,115.00 |
| | 2/21/2007 | 400 | $91.25 | $36,500.00 |

| | 2/22/2007 | 3,000 | $90.40 | $271,200.00 |
|---|---|---|---|---|
| | 2/22/2007 | 2,800 | $90.40 | $253,120.00 |
| | 2/22/2007 | 2,500 | $90.40 | $226,000.00 |
| | 2/22/2007 | 2,200 | $90.40 | $198,880.00 |
| | 2/22/2007 | 1,900 | $90.40 | $171,760.00 |
| | 2/22/2007 | 1,200 | $90.40 | $108,480.00 |
| | 2/22/2007 | 1,100 | $90.40 | $99,440.00 |
| | 2/22/2007 | 700 | $90.40 | $63,280.00 |
| | 2/22/2007 | 500 | $90.40 | $45,200.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 200 | $90.40 | $18,080.00 |
| | 2/22/2007 | 100 | $90.40 | $9,040.00 |
| | 2/22/2007 | 400 | $90.41 | $36,164.00 |
| | 2/22/2007 | 300 | $90.41 | $27,123.00 |
| | 2/22/2007 | 100 | $90.41 | $9,041.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 700 | $90.42 | $63,294.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 400 | $90.42 | $36,168.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 300 | $90.42 | $27,126.00 |
| | 2/22/2007 | 200 | $90.42 | $18,084.00 |
| | 2/22/2007 | 100 | $90.42 | $9,042.00 |
| | 2/22/2007 | 800 | $90.43 | $72,344.00 |
| | 2/22/2007 | 700 | $90.43 | $63,301.00 |
| | 2/22/2007 | 400 | $90.43 | $36,172.00 |
| | 2/22/2007 | 200 | $90.43 | $18,086.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 100 | $90.43 | $9,043.00 |
| | 2/22/2007 | 900 | $90.44 | $81,396.00 |
| | 2/22/2007 | 800 | $90.44 | $72,352.00 |
| | 2/22/2007 | 600 | $90.44 | $54,264.00 |
| | 2/22/2007 | 400 | $90.44 | $36,176.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 300 | $90.44 | $27,132.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 200 | $90.44 | $18,088.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 100 | $90.44 | $9,044.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 600 | $90.45 | $54,270.00 |
| | 2/22/2007 | 500 | $90.45 | $45,225.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
| | 2/22/2007 | 300 | $90.45 | $27,135.00 |

| | 2/22/2007 | 300 | $90.45 | $27,135.00 |
|---|---|---|---|---|
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 200 | $90.45 | $18,090.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 100 | $90.45 | $9,045.00 |
| | 2/22/2007 | 500 | $90.46 | $45,230.00 |
| | 2/22/2007 | 300 | $90.46 | $27,138.00 |
| | 2/22/2007 | 200 | $90.46 | $18,092.00 |
| | 2/22/2007 | 500 | $90.47 | $45,235.00 |
| | 2/22/2007 | 400 | $90.47 | $36,188.00 |
| | 2/22/2007 | 163 | $90.47 | $14,746.61 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 100 | $90.47 | $9,047.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 300 | $90.48 | $27,144.00 |
| | 2/22/2007 | 200 | $90.48 | $18,096.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 100 | $90.48 | $9,048.00 |
| | 2/22/2007 | 900 | $90.49 | $81,441.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 800 | $90.49 | $72,392.00 |
| | 2/22/2007 | 700 | $90.49 | $63,343.00 |
| | 2/22/2007 | 500 | $90.49 | $45,245.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 300 | $90.49 | $27,147.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 200 | $90.49 | $18,098.00 |
| | 2/22/2007 | 100 | $90.49 | $9,049.00 |
| | 2/22/2007 | 1,100 | $90.50 | $99,550.00 |
| | 2/22/2007 | 900 | $90.50 | $81,450.00 |
| | 2/22/2007 | 700 | $90.50 | $63,350.00 |
| | 2/22/2007 | 600 | $90.50 | $54,300.00 |
| | 2/22/2007 | 200 | $90.50 | $18,100.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.50 | $18,100.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 100 | $90.50 | $9,050.00 |
| | 2/22/2007 | 200 | $90.51 | $18,102.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.52 | $36,208.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 200 | $90.52 | $18,104.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 100 | $90.52 | $9,052.00 |
| | 2/22/2007 | 400 | $90.53 | $36,212.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
| | 2/22/2007 | 300 | $90.53 | $27,159.00 |

| | 2/22/2007 | 300 | $90.53 | $27,159.00 |
|---|---|---|---|---|
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 100 | $90.53 | $9,053.00 |
| | 2/22/2007 | 200 | $90.53 | $18,106.00 |
| | 2/22/2007 | 1,800 | $90.54 | $162,972.00 |
| | 2/22/2007 | 1,100 | $90.54 | $99,594.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 600 | $90.54 | $54,324.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 300 | $90.54 | $27,162.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 200 | $90.54 | $18,108.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.54 | $9,054.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 100 | $90.55 | $9,055.00 |
| | 2/22/2007 | 200 | $90.56 | $18,112.00 |
| | 2/22/2007 | 100 | $90.56 | $9,056.00 |
| | 2/22/2007 | 100 | $90.58 | $9,058.00 |
| | 2/22/2007 | 300 | $90.59 | $27,177.00 |
| | 2/22/2007 | 100 | $90.59 | $9,059.00 |
| | 2/22/2007 | 100 | $90.60 | $9,060.00 |
| | 2/22/2007 | 600 | $90.60 | $54,360.00 |
| | 2/22/2007 | 200 | $90.61 | $18,122.00 |
| | 2/22/2007 | 600 | $90.62 | $54,372.00 |
| | 2/22/2007 | 500 | $90.62 | $45,310.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |
| | 2/22/2007 | 300 | $90.62 | $27,186.00 |
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 200 | $90.62 | $18,124.00 |
| | 2/22/2007 | 100 | $90.62 | $9,062.00 |
| | 2/22/2007 | 500 | $90.63 | $45,315.00 |
| | 2/22/2007 | 400 | $90.63 | $36,252.00 |
| | 2/22/2007 | 300 | $90.63 | $27,189.00 |
| | 2/22/2007 | 200 | $90.63 | $18,126.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 100 | $90.63 | $9,063.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 400 | $90.64 | $36,256.00 |
| | 2/22/2007 | 200 | $90.64 | $18,128.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |
| | 2/22/2007 | 100 | $90.64 | $9,064.00 |

| | | | |
|---|---|---|---|
| | 2/22/2007 | 500 | $90.65 | $45,325.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 200 | $90.65 | $18,130.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.65 | $27,195.00 |
| | 2/22/2007 | 100 | $90.65 | $9,065.00 |
| | 2/22/2007 | 300 | $90.66 | $27,198.00 |
| | 2/22/2007 | 200 | $90.66 | $18,132.00 |
| | 2/22/2007 | 100 | $90.66 | $9,066.00 |
| | 2/22/2007 | 1,000 | $90.67 | $90,670.00 |
| | 2/22/2007 | 500 | $90.67 | $45,335.00 |
| | 2/22/2007 | 400 | $90.67 | $36,268.00 |
| | 2/22/2007 | 300 | $90.67 | $27,201.00 |
| | 2/22/2007 | 200 | $90.67 | $18,134.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 100 | $90.67 | $9,067.00 |
| | 2/22/2007 | 500 | $90.68 | $45,340.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 200 | $90.68 | $18,136.00 |
| | 2/22/2007 | 300 | $90.70 | $27,210.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 100 | $90.70 | $9,070.00 |
| | 2/22/2007 | 400 | $90.71 | $36,284.00 |
| | 2/22/2007 | 100 | $90.72 | $9,072.00 |
| | 2/22/2007 | 100 | $90.74 | $9,074.00 |
| | | **941,438** | | **$77,532,993.23** |
| | | | | |
| **MCDONOUGH** | 11/11/2005 | 2,332 | $75.69 | $176,509.08 |
| | 3/23/2006 | 3,100 | $79.36 | $246,016.00 |
| | 3/23/2006 | 300 | $79.37 | $23,811.00 |
| | 3/23/2006 | 1,400 | $79.38 | $111,132.00 |
| | 3/23/2006 | 600 | $79.39 | $47,634.00 |
| | 3/23/2006 | 100 | $79.40 | $7,940.00 |
| | 3/23/2006 | 200 | $79.41 | $15,882.00 |
| | 3/23/2006 | 1,600 | $79.42 | $127,072.00 |
| | 3/23/2006 | 600 | $79.43 | $47,658.00 |
| | 3/23/2006 | 1,000 | $79.44 | $79,440.00 |
| | 3/23/2006 | 800 | $79.45 | $63,560.00 |
| | 3/23/2006 | 100 | $79.51 | $7,951.00 |
| | 3/23/2006 | 200 | $79.58 | $15,916.00 |
| | 3/23/2006 | 1,100 | $79.62 | $87,582.00 |
| | 3/23/2006 | 100 | $79.61 | $7,961.00 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/16/2007 | 600 | $91.02 | $54,612.00 |
| | 2/16/2007 | 100 | $91.04 | $9,104.00 |
| | 2/16/2007 | 200 | $91.05 | $18,210.00 |
| | 2/16/2007 | 900 | $91.06 | $81,954.00 |
| | 2/16/2007 | 300 | $91.07 | $27,321.00 |
| | 2/16/2007 | 100 | $91.09 | $9,109.00 |
| | 2/16/2007 | 100 | $91.10 | $9,110.00 |

| | | | |
|---|---|---|---|
| | 2/16/2007 | 100 | $91.12 | $9,112.00 |
| | 2/16/2007 | 200 | $91.15 | $18,230.00 |
| | 2/16/2007 | 200 | $91.17 | $18,234.00 |
| | 2/16/2007 | 200 | $91.18 | $18,236.00 |
| | 2/16/2007 | 100 | $91.19 | $9,119.00 |
| | 2/16/2007 | 400 | $91.20 | $36,480.00 |
| | 2/16/2007 | 1,000 | $91.22 | $91,220.00 |
| | 2/16/2007 | 200 | $91.23 | $18,246.00 |
| | 2/16/2007 | 200 | $91.24 | $18,248.00 |
| | 2/16/2007 | 584 | $91.25 | $53,290.00 |
| | 2/16/2007 | 216 | $91.26 | $19,712.16 |
| | 2/16/2007 | 1,300 | $91.27 | $118,651.00 |
| | 2/16/2007 | 800 | $91.28 | $73,024.00 |
| | 2/16/2007 | 1,600 | $91.29 | $146,064.00 |
| | 2/16/2007 | 700 | $91.30 | $63,910.00 |
| | 2/16/2007 | 300 | $91.31 | $27,393.00 |
| | 2/16/2007 | 100 | $91.32 | $9,132.00 |
| | 2/16/2007 | 100 | $91.33 | $9,133.00 |
| | 2/16/2007 | 100 | $91.36 | $9,136.00 |
| | 2/16/2007 | 100 | $91.38 | $9,138.00 |
| | 2/16/2007 | 100 | $91.40 | $9,140.00 |
| | 2/16/2007 | 200 | $91.43 | $18,286.00 |
| | 2/16/2007 | 100 | $91.46 | $9,146.00 |
| | 2/16/2007 | 100 | $91.47 | $9,147.00 |
| | 2/16/2007 | 100 | $91.49 | $9,149.00 |
| | 2/16/2007 | 100 | $91.59 | $9,159.00 |
| | | **26,437** | | **$2,239,603.89** |
| | | | | |
| **MCKINNON** | 1/27/2006 | 226 | $76.64 | $17,320.64 |
| | 1/27/2006 | 197 | $76.64 | $15,098.08 |
| | 1/27/2006 | 78 | $76.64 | $5,977.92 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 759 | $88.53 | $67,194.27 |
| | 2/2/2007 | 257 | $88.53 | $22,752.21 |
| | 2/2/2007 | 208 | $88.53 | $18,414.24 |
| | 2/2/2007 | 174 | $88.53 | $15,404.22 |
| | 2/2/2007 | 163 | $88.53 | $14,430.39 |
| | 2/2/2007 | 67 | $88.53 | $5,931.51 |
| | 2/15/2007 | 100 | $91.00 | $9,100.00 |
| | 2/15/2007 | 1,054 | $91.01 | $95,924.54 |
| | 2/15/2007 | 810 | $91.02 | $73,726.20 |
| | 2/15/2007 | 3,386 | $91.03 | $308,227.58 |
| | 2/15/2007 | 1,505 | $91.04 | $137,015.20 |
| | 2/15/2007 | 538 | $91.05 | $48,984.90 |
| | 2/15/2007 | 519 | $91.06 | $47,260.14 |
| | 2/15/2007 | 219 | $91.07 | $19,944.33 |
| | 2/15/2007 | 19 | $91.08 | $1,730.52 |
| | 2/15/2007 | 100 | $91.10 | $9,110.00 |
| | 7/23/2007 | 1,579 | $80.34 | $126,856.86 |
| | | **12,895** | | **$1,143,356.36** |
| | | | | |

| RENFIELD MILLER | 3/15/2006 | 5,580 | $79.50 | $443,610.00 |
|---|---|---|---|---|
| | 7/28/2006 | 8,240 | $83.16 | $685,238.40 |
| | 2/2/2007 | 1,232 | $88.53 | $109,068.96 |
| | 2/2/2007 | 609 | $88.53 | $53,914.77 |
| | 5/1/2007 | 500 | $92.22 | $46,110.00 |
| | 5/1/2007 | 100 | $92.23 | $9,223.00 |
| | 5/1/2007 | 400 | $92.24 | $36,896.00 |
| | 5/1/2007 | 200 | $92.27 | $18,454.00 |
| | 5/1/2007 | 700 | $92.30 | $64,610.00 |
| | 5/1/2007 | 100 | $92.38 | $9,238.00 |
| | 5/1/2007 | 100 | $92.39 | $9,239.00 |
| | 5/1/2007 | 200 | $92.44 | $18,488.00 |
| | 5/1/2007 | 1,800 | $92.46 | $166,428.00 |
| | 5/1/2007 | 700 | $92.47 | $64,729.00 |
| | 5/1/2007 | 700 | $92.48 | $64,736.00 |
| | 5/1/2007 | 900 | $92.49 | $83,241.00 |
| | 5/1/2007 | 500 | $92.50 | $46,250.00 |
| | 5/1/2007 | 200 | $92.51 | $18,502.00 |
| | 5/4/2007 | 349 | $94.16 | $32,861.84 |
| | | **23,110** | | **$1,980,837.97** |
| | | | | |
| SHOBACK | 11/23/2005 | 545 | $77.40 | $42,183.00 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 11/23/2005 | 5,606 | $77.54 | $434,689.24 |
| | 12/16/2005 | 2,000 | $77.58 | $155,160.00 |
| | 12/16/2005 | 1,300 | $77.60 | $100,880.00 |
| | 12/16/2005 | 488 | $77.64 | $37,888.32 |
| | 12/23/2005 | 419 | $78.41 | $32,853.79 |
| | 1/27/2006 | 71 | $76.64 | $5,441.44 |
| | 8/28/2006 | 5,800 | $85.82 | $497,756.00 |
| | 8/28/2006 | 275 | $85.92 | $23,628.00 |
| | 9/7/2006 | 172 | $84.59 | $14,549.48 |
| | 11/27/2006 | 796 | $83.57 | $66,521.72 |
| | 2/2/2007 | 937 | $88.53 | $82,952.61 |
| | 2/2/2007 | 469 | $88.53 | $41,520.57 |
| | 2/2/2007 | 468 | $88.53 | $41,432.04 |
| | 2/2/2007 | 315 | $88.53 | $27,886.95 |
| | 2/2/2007 | 190 | $88.53 | $16,820.70 |
| | 2/2/2007 | 173 | $88.53 | $15,315.69 |
| | 2/2/2007 | 48 | $88.53 | $4,249.44 |
| | 5/29/2007 | 450 | $91.86 | $41,337.00 |
| | 6/6/2007 | 1 | $88.15 | $88.15 |
| | 9/7/2007 | 229 | $60.08 | $13,758.32 |
| | | **26,358** | | **$2,131,601.70** |
| | | | | |
| UHLEIN | 11/11/2005 | 9,482 | $75.50 | $715,891.00 |
| | 12/19/2005 | 6,497 | $77.76 | $505,206.72 |
| | 1/27/2006 | 1,765 | $76.64 | $135,269.60 |
| | 3/20/2006 | 3,800 | $81.90 | $311,220.00 |
| | 3/20/2006 | 200 | $81.92 | $16,384.00 |
| | 8/24/2006 | 3,100 | $85.50 | $265,050.00 |

| | | | | |
|---|---|---|---|---|
| | 8/24/2006 | 300 | $85.51 | $25,653.00 |
| | 8/24/2006 | 900 | $85.52 | $76,968.00 |
| | 8/24/2006 | 100 | $85.53 | $8,553.00 |
| | 8/24/2006 | 400 | $85.54 | $34,216.00 |
| | 8/24/2006 | 1,400 | $85.55 | $119,770.00 |
| | 8/24/2006 | 900 | $85.58 | $77,022.00 |
| | 8/24/2006 | 200 | $85.59 | $17,118.00 |
| | 8/24/2006 | 400 | $85.60 | $34,240.00 |
| | 8/24/2006 | 300 | $85.61 | $25,683.00 |
| | 8/24/2006 | 400 | $85.62 | $34,248.00 |
| | 8/24/2006 | 289 | $85.65 | $24,752.85 |
| | 8/25/2006 | 100 | $85.33 | $8,533.00 |
| | 8/25/2006 | 100 | $85.34 | $8,534.00 |
| | 8/25/2006 | 100 | $85.35 | $8,535.00 |
| | 8/25/2006 | 2,100 | $85.36 | $179,256.00 |
| | 8/25/2006 | 500 | $85.38 | $42,690.00 |
| | 8/25/2006 | 200 | $85.40 | $17,080.00 |
| | 8/25/2006 | 100 | $85.43 | $8,543.00 |
| | 8/25/2006 | 1,700 | $85.44 | $145,248.00 |
| | 8/25/2006 | 1,900 | $85.47 | $162,393.00 |
| | 8/25/2006 | 100 | $85.48 | $8,548.00 |
| | 8/25/2006 | 200 | $85.49 | $17,098.00 |
| | 8/25/2006 | 3,400 | $85.50 | $290,700.00 |
| | 8/25/2006 | 300 | $85.51 | $25,653.00 |
| | 8/25/2006 | 200 | $85.52 | $17,104.00 |
| | 8/25/2006 | 100 | $85.53 | $8,553.00 |
| | 8/25/2006 | 200 | $85.54 | $17,108.00 |
| | 2/2/2007 | 4,037 | $88.53 | $357,395.61 |
| | 2/2/2007 | 1,885 | $88.53 | $166,879.05 |
| | 2/2/2007 | 828 | $88.53 | $73,302.84 |
| | 2/2/2007 | 441 | $88.53 | $39,041.73 |
| | 4/27/2007 | 1,000 | $93.05 | $93,050.00 |
| | 4/27/2007 | 800 | $93.06 | $74,448.00 |
| | 4/27/2007 | 700 | $93.07 | $65,149.00 |
| | 4/27/2007 | 400 | $93.08 | $37,232.00 |
| | 4/27/2007 | 700 | $93.09 | $65,163.00 |
| | 4/27/2007 | 5,600 | $93.10 | $521,360.00 |
| | 4/27/2007 | 800 | $93.12 | $74,496.00 |
| | | **58,924** | | **$4,960,338.40** |
| | | | | |
| **WALLIS** | 11/22/2005 | 5,300 | $75.85 | $402,005.00 |
| | 11/22/2005 | 1,431 | $75.98 | $108,727.38 |
| | 2/2/2007 | 710 | $88.53 | $62,856.30 |
| | 2/2/2007 | 321 | $88.53 | $28,418.13 |
| | 4/27/2007 | 1,300 | $92.70 | $120,510.00 |
| | 4/27/2007 | 1,754 | $92.71 | $162,613.34 |
| | 4/27/2007 | 2,000 | $92.72 | $185,440.00 |
| | 4/27/2007 | 1,300 | $92.75 | $120,575.00 |
| | 4/27/2007 | 100 | $92.76 | $9,276.00 |
| | | **14,216** | | **$1,200,421.15** |
| | | | | |

| TOTAL: | | 1,591,407 | | $131,959,672.12 | |

## DEMAND IS EXCUSED FOR FUTILITY

90.    Plaintiff incorporates by reference and realleges each and every paragraph above as if fully set forth herein.  Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged herein.  Therefore, such a demand is excused.

91.    Ambac is controlled by its Board, which currently consists of the following seven individuals: Michael A. Callen, Jill M. Considine, Thomas C. Theobald, Laura S. Unger, Henry D. G. Wallace, Phillip B. Lassiter, and Philip N. Duff.  All these directors are named as Defendants in this lawsuit and engaged in the wrongful acts alleged herein.  Thus, they are not disinterested and cannot exercise independent business judgment on the issue of whether Ambac should prosecute this action.  As a result, demand on Ambac and its Board is futile and therefore excused.

92.    Demand is excused because a majority of the members of the current Board intentionally or recklessly either: (1) directly participated in the wrongs alleged herein to benefit themselves at the expense of the Company; (2) caused Ambac to enter into the CDO market  and over- expand into the CDO market; (3) failed to adopt reasonable internal controls and independent monitoring systems to ensure the investing public was provided with accurate information on the Company's financial outlook; or (4) ignored repeated specific warnings that CDOs were falling subject to the current housing crisis, and thus, the Company's business operations, finances, business metrics, future business and financial prospects had been flagrantly overestimated.

93.    Ambac's current directors named in this suit  cannot be expected to file a derivative claim because such a claim would not be covered under the Company's directors' and officers' insurance policy.

94.     Defendants Callen, Considine, Theobald, Unger, and Wallace, as members of the Board during the Relevant Period, authorized the repurchases of over $578 million worth of the Company's shares at artificially inflated prices (on average $86.56 per share).  Ambac repurchased these shares under two stock repurchase programs that the Board authorized during May 2005 and October 2006.  Certain officers and directors sold their own personal stock during these buybacks.  The Board's decision to authorize the stock repurchases were not the product of valid business judgment.  Among other things, the Board failed to properly discuss or consider Ambac's exposure to the subprime mortgage credit market crisis.  Accordingly, demand is futile.

95.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, defendant Callen knew the adverse, non-public information regarding Ambac's true business prospects.  While in possession of this material, adverse, non-public information regarding the Company, Callen sold 11,750 shares of Ambac stock for $942,857 in proceeds.  Because Callen received a personal financial benefit from the challenged insider trading transactions, Callen is interested.  Moreover, Callen faces a sufficiently substantial threat of liability for his breach of fiduciary duties for insider selling.  Since Callen breached his fiduciary duties and is interested, any demand upon him is futile.

96.     Defendants Callen, Considine, Theobald, Unger and Wallace all served on the Audit and Risk Assessment Committee during the Relevant Period.  The Audit and Risk Assessment Committee, by its charter, is to monitor the corporate control and risk environment of Ambac.  Thus, defendants Callen, Considine, Theobald, Unger and Wallace had a duty to know and accordingly did know that: (i) Ambac, because of its CDO insurance, faced significant exposure to the subprime mortgage and credit crises and that (ii) the Company's Relevant Period statements did not adequately

disclose this exposure. On information and belief, the Audit and Risk Assessment Committee reviewed and discussed Ambac's exposures to the subprime and credit crises, which had been ongoing since at least mid-2006, while performing its duty to review and discuss Ambac's major financial exposures and procedures to manage those exposures. Despite their knowledge of Ambac's exposure to the subprime mortgage and credit crises, these defendants consciously disregarded their fiduciary duties owed to Ambac by causing or allowing the improper statements alleged above. Thus, Callen, Considine, Theobald, Unger and Wallace face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

97.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

98.     The Individual Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Ambac's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

99.     The acts complained of constitute violations of fiduciary duties owed by Ambac's officers and directors and these acts are incapable of ratification.

100.    Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

101.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Ambac for any of the wrongdoing alleged by plaintiff herein.

102.    Plaintiff has not made any demand on shareholders of Ambac to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Ambac is a publicly held company with over 100 million shares outstanding and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

103.    As alleged more fully above, Defendant Callen has held the titles of Ambac's Chairman of the Board of Directors, CEO, presiding director and is currently remains on the Board of Directors.  By virtue of these positions it is unreasonable to expect that the Board of Directors would initiate such litigation or be able to prosecute a lawsuit against him, and hence demand is futile.  As set forth herein, Callen directly participated in numerous schemes to hide the truth about the Company's financial condition to enrich himself at the expense and to the detriment of the Company.  Callen's blatant violations of his fiduciary duties of care and loyalty render him incapable of considering a demand in respect to his direct personal interest in the conduct and transactions challenged herein.  Indeed, Callen's conduct was so facially egregious that it could not have been the product of sound business judgment.

104.    Defendant Considine is currently the presiding director of the Board of Directors and remains a member of the Audit and Risk Committee, Compensation Committee and Governance

Committee.  By virtue of these positions she has tremendous influence over her fellow members of the Board of Directors and it is unreasonable to expect them to authorize a lawsuit against her.   She likewise participated in numerous schemes to hide the truth about the Company's financial condition to enrich herself at the expense and to the detriment of the Company.  Considine's blatant violations of her fiduciary duties of care and loyalty render her incapable of considering a demand in respect to her direct personal interest in the conduct and transactions challenged herein.  Indeed, Considine's conduct was so facially egregious that it could not have been the product of sound business judgment.

105.   Defendant Unger has been a director and a member of the Audit and Risk Committee, Compensation Committee and Governance Committee since 2002.  Prior to working with Ambac on the Board of Directors, Unger was Commissioner of the Securities and Exchange Commission. Defendant Unger is now the Chair of the Governance Committee.  By virtue of these positions she has tremendous influence over her fellow members of the Board of Directors and it is unreasonable to expect them to authorize a lawsuit against her.   She likewise participated in numerous schemes to hide the truth about the Company's financial condition to enrich herself at the expense and to the detriment of the Company.  Unger's blatant violations of her fiduciary duties of care and loyalty render her incapable of considering a demand in respect to her direct personal interest in the conduct and transactions challenged herein.  Indeed, Unger's conduct was so facially egregious that it could not have been the product of sound business judgment.

106.   Defendant Wallace has been a member of the Board of Directors since May of 2004 and is currently a member of the Audit and Risk Committee, Compensation Committee and Governance Committee.  Wallace is currently the Chair of the Audit and Risk Assessment Committee.  By virtue of these positions it is unreasonable to expect that the Board of Directors would initiate such litigation or be able to prosecute a lawsuit against him, and hence demand is futile.

As set forth herein, Wallace directly participated in numerous schemes to hide the truth about the Company's financial condition to enrich himself at the expense and to the detriment of the Company. Wallace's blatant violations of his fiduciary duties of care and loyalty render him incapable of considering a demand in respect to his direct personal interest in the conduct and transactions challenged herein. Indeed, Wallace's conduct was so facially egregious that it could not have been the product of sound business judgment.

107.    Defendant Theobald has been a member of the Board of Directors since August of 2004 and is currently a member of the Audit and Risk Committee, Compensation Committee and Governance Committee. Theobald is currently the Chair of the Compensation Committee. By virtue of these positions it is unreasonable to expect that the Board of Directors would initiate such litigation or be able to prosecute a lawsuit against him, and hence demand is futile. As set forth herein, Theobald directly participated in numerous schemes to hide the truth about the Company's financial condition to enrich himself at the expense and to the detriment of the Company. Theobald's blatant violations of his fiduciary duties of care and loyalty render him incapable of considering a demand in respect to his direct personal interest in the conduct and transactions challenged herein. Indeed, Theobald's conduct was so facially egregious that it could not have been the product of sound business judgment.

108.    Defendant Duff has been a member of the Board of Directors since May of 2007 and is currently a member of the Audit and Risk Committee, Compensation Committee and Governance Committee. By virtue of these positions it is unreasonable to expect that the Board of Directors would initiate such litigation or be able to prosecute a lawsuit against him, and hence demand is futile. As set forth herein, Duff directly participated in numerous schemes to hide the truth about the Company's financial condition to enrich himself at the expense and to the detriment of the Company.

Duff's blatant violations of his fiduciary duties of care and loyalty render him incapable of considering a demand in respect to his direct personal interest in the conduct and transactions challenged herein. Indeed, Duff's conduct was so facially egregious that it could not have been the product of sound business judgment.

109.    Defendant Lassiter has been a member of the Board of Directors since at least 1991, when he was Chairman of the Board. Lassiter was CEO of the Company and Chairman of the Board for 14 years, from 1991 until 2004 when he became a Director of Ambac. By virtue of these positions it is unreasonable to expect that the Board of Directors would initiate such litigation or be able to prosecute a lawsuit against him, and hence demand is futile. As set forth herein, Lassiter directly participated in numerous schemes to hide the truth about the Company's financial condition to enrich himself at the expense and to the detriment of the Company. Lassiter's blatant violations of his fiduciary duties of care and loyalty render him incapable of considering a demand in respect to his direct personal interest in the conduct and transactions challenged herein. Indeed, Lassiter's conduct was so facially egregious that it could not have been the product of sound business judgment.

110.    Defendants Wallace and Lassiter both serve on the Board of Directors of Diebold, Inc. Due to their multiple business relationships, Wallace cannot be expected to sue Lassiter, and vice versa. Wallace and Lassiter are therefore not disinterested.

111.    Individual Defendants Considine, Duff, Theobald, Unger and Wallace were non-employee members of the Board of Directors during the Relevant Period and received compensation from Ambac, including restricted stock units. For instance, Nonemployee directors of Ambac are compensated for their services as directors through the payment of annual cash retainer fees, restricted stock units, meeting fees, stock awards, and additional fees for presiding directors and chairman fees.. Directors receive an annual retainer of $80,000 (Lassiter while Chairman also received $250,000 per

year, now $25,000 is given to the presiding director);Directors serving as a Committee Chair receive an additional annual retainer of $10,000, $20,000 for chairing the Audit and Risk Assessment Committee; Directors upon election receives $210,000 in restricted stock units that vests in five years.; and all expenses incurred for attending meetings are reimbursed.

112.    For services rendered in 2006, the directors received the following remuneration: Defendant Callen received $278,510; Defendant Considine received $414,700; Defendant Theobald received $197,000; Defendant Unger received $190,982; Defendant Wallace received $195,333; and Defendant Duff stands to make roughly $200,000 for 2007.   Accordingly, Defendants Callen, Considine, Theobald, Unger, Wallace and Duff will not take the action requested by Plaintiff as they have an interest in not jeopardizing their substantial compensation as Ambac's directors.

113.    Additionally, Defendants Theobald, Considine, Unger, Wallace and Duff all serve as the sole members of Ambac's current Compensation Committee.  Consequently, the Board will not sue these Individual Defendants since they are the ones who oversee and make recommendations regarding the compensation of themselves and their fellow directors.

114.    Additionally, Defendants Theobald, Considine, Unger, Wallace and Duff all serve as the sole members of Ambac's current Audit and Risk Assessment Committee.  Consequently, the Board will not sue these Individual Defendants since they are would have to sue themselves, and hence demand is futile because they would not initiate such litigation, nor be able to prosecute any such action.  Thus, none of the Individual Defendants is in a position to exercise independent business judgment with respect to the claims alleged herein due to each of their participation in the wrongful conduct giving rise to the claims asserted herein, which have damaged and will continue to damage Ambac.

115.    Further, Defendants Theobald, Considine, Wallace and Duff all are designated financial experts by Ambac.  Due to their financial backgrounds, Defendants Theobald, Considine, Wallace and Duff should have been able to determine that the Company's financial statements were false and that the Company was over-exposed to the CDO market.

116.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Ambac, by prosecuting this action. Therefore, demand on Ambac and its Board is futile and is excused.

117.    In fact, because of the Individual Defendants' conduct alleged above, the Individual Defendants would have to sue themselves, and hence demand is futile because they would not initiate such litigation, nor be able to prosecute any such action.  Thus, none of the Individual Defendants is in a position to exercise independent business judgment with respect to the claims alleged herein due to each of their participation in the wrongful conduct giving rise to the claims asserted herein, which have damaged and will continue to damage Ambac.

### FIRST CAUSE OF ACTION
**(Against all Defendants for Breach of Fiduciary Duty)**

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    Defendants, by virtue of their positions as directors and/or officers of Ambac, owed to the Company and to its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of Ambac and in the use and preservation of its property and assets.

120.    To discharge these duties, Defendants were each required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Ambac, and to insure that Ambac issued truthful statements about its financial condition.  This obligation of due care and diligence required, among other things, that Defendants:

- exercise reasonable control and supervision over the officers, employees and agents of Ambac;

- remain informed as to how Ambac conducted its operations;

- ensure the prudence and soundness of the policies and practices undertaken or proposed to be undertaken by Ambac;

- ensure Ambac complies with its legal obligations and requirements, including the duty to disseminate truthful and accurate statements to the SEC and the investing public;

- make a reasonable investigation upon receiving notice or information of an imprudent or unsound decision, condition, or practice, and take steps to correct any imprudent or unsound decision, condition, or practice; and

- conduct the affairs of Ambac in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business and to thereby maximize the profits to its stockholders.

121.    By reason of their positions, and because of their ability to control the business and corporate affairs of Ambac, at all relevant times, Defendants owed to Ambac and to its stockholders, fiduciary obligations of fidelity, trust, loyalty, and due care, and were required to control the company in a fair, just and equitable manner and to act in furtherance of the best interests of the company and its stockholders.

122.    By committing the acts alleged above, Defendants breached their fiduciary duties to Ambac.  Had Defendants properly discharged their obligations and duties, they could have prevented the harm caused to Ambac as alleged herein.

123.    As a direct and proximate result of Defendants' breaches of fiduciary duties, Ambac has sustained significant damages.

124.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to Ambac.

125.    Plaintiff, on behalf of Ambac, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Against all Individual Defendants for Unjust Enrichment)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    At the time of the Company's misstatements and all relevant times stated herein, the Individual Defendants received bonuses, stock options, stock appreciation rights and/or similar such compensation from Ambac in breach of their fiduciary duties.  The Individual Defendants were unjustly enriched thereby.  The Individual Defendants also sold their Ambac stock while in possession of material, undisclosed inside information, and were unjustly enriched as a result of their receipt of the proceeds from the insider selling.

128.    To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge all proceeds the Individual Defendants received from their bonuses,  stock options, and insider selling,.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Ambac, prays for judgment as follows:

A.    A determination that this suit is a proper derivative action and certifying Plaintiff as an appropriate representative of Ambac for this action;

B.    A declaration that each of the Defendants breached his or her fiduciary duties to Ambac;

C.    A determination and award to Ambac for the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

D.    A declaration that the Company must take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

1)    strengthening the board's supervision and oversight responsibilities and developing a system to ensure the board accurately manages the Company's risk potential;

2)    prohibiting an individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

3)    allowing the Company's shareholders to nominate at least one candidate for election to the board; and

4)    a policy of ensuring the accuracy of the qualifications of the Company's directors, executives and other employees;

E    An award to Plaintiff for the costs and disbursements of this action, including reasonable fees and costs to Plaintiff's attorneys and experts; and

F.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  February 8, 2008                    **MURRAY, FRANK & SAILER, LLP**


S/
_____
Brian Murray (BM 9954)
275 Madison Avenue, Suite 801
New York, NY 10016
(212)682-1818

**JOHNSON BOTTINI, LLP**
FRANK J. JOHNSON
FRANCIS A. BOTTINI, JR.
DEREK J. WILSON
655 West Broadway, Suite 1400
San Diego, CA 92101
(619)230-0063


*Attorneys for Plaintiff*

## VERIFICATION

I, Earl Jordan Yaokasin , hereby verify that I am a shareholder of Ambac Financial Group, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: _____            _____
                                 Earl Jordan Yaokasin

- 1 -